THE BOROUGH OF BELMAR POLICEMEN'S BENEVOLENT ASSO-
CIATION OF LOCAL # 50, RICHARD LYNCH, ANDREW DO-
NATE AND MRS. NETTIE ANNE AKER, INDIVIDUALLY AS
PLAINTIFFS, PLAINTIFFS-RESPONDENTS AND CROSS-RE-
SPONDENTS, v. BOROUGH OF BELMAR AND LAWRENCE A.
VOLA, CHIEF OF POLICE, DEFENDANTS-APPELLANTS AND
CROSS-RESPONDENTS, AND JUDITH A. YASKIN, ACTING
ATTORNEY GENERAL OF NEW JERSEY, INTERVENOR-
CROSS-APPELLANT.

Argued January 25, 1982—Decided May 10, 1982.

*Frederick P. DeVesa*, Assistant Attorney General, argued the cause for intervenor-cross-appellant (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney; *Frederick P. DeVesa, Larry R. Etzweiler*, Deputy Attorney General, *John DeCicco*, Assistant Attorney General and *Robert E. Rochford*, Deputy Attorney General, of counsel; *Larry R. Etzweiler*, on the briefs).

*Joseph Hillman, Jr.* argued the cause for appellants (*Hillman, Carey, Badach & Sullivan*, attorneys).

*Jacob Green* argued the cause for *amicus curiae* New Jersey State Special Police Association, Inc. (*Green & Dzwilewski*, attorneys; *Ellen Harrison*, on the briefs).

*Mark S. Ruderman* argued the cause for *amicus curiae* New Jersey State League of Municipalities (*Dorf and Glickman*, attorneys).

*Laurence M. McHeffey* argued the cause for respondents (*Hanlon, Dempsey & McHeffey*, attorneys).

*Kenneth I. Nowak* argued the cause for *amicus curiae* New Jersey State Policemen's Benevolent Association (*Zazzali & Kroll*, attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

This case raises important questions concerning the status and powers of special police officers employed by municipalities. The particular issues are whether the Borough of Belmar, a resort community, may use special police officers during the busy summer season to supplement the regular staff, and whether special police officers may carry weapons while on duty and exercise the same authority to arrest as regular police.

The Borough of Belmar Policemen's Benevolent Association of Local # 50 (PBA), the duly authorized collective bargaining agent for the members of the regular police force, filed a complaint in lieu of prerogative writ to enjoin the Borough from using special policemen to perform the usual duties of regular police officers and from issuing sidearms to special police. Three individual residents and taxpayers of the Borough subsequently joined in the suit as parties plaintiff. The Attorney General and the New Jersey State Policemen's Benevolent Association intervened as *amici curiae*. After a plenary hearing the trial court enjoined the defendant from utilizing special police.

The trial court's judgment was stayed pending appeal. The Appellate Division, 178 *N.J.Super.* 473, modifying 174 *N.J.Super.* 370, affirmed the judgment, though rejecting that part of the trial court's opinion relating to the applicability of the Police Training Act. The Attorney General's petition for a rehearing was denied. The Borough and the Attorney General, whose motion for leave to intervene as a defendant had been granted by this Court, filed petitions for certification. We granted both petitions. 87 *N.J.* 424 (1981), and 87 *N.J.* 425 (1981). We

granted the New Jersey State Special Police Association, Inc. and the New Jersey State League of Municipalities leave to intervene as *amici curiae.*

The facts underlying this action are not disputed. Belmar maintains a regular police force of twenty-one members, composed of a chief, three captains, four sergeants and thirteen patrolmen. Police are assigned to three eight-hour shifts and one relief shift. On each shift four officers are assigned to four designated posts: one officer patrols the business district either on foot or by motor scooter; one mans the desk at headquarters; and two ride in patrol cars. They rotate from post to post on a weekly basis following a schedule fixed by the Chief of Police. Two officers are assigned to the detective division.

The increased summer population creates a demand for additional police services. The beaches and boardwalks are crowded and noisy parties are common during weekends, especially at group rentals. Conscious of fiscal constraints and of the Local Government Cap Law limitations, *N.J.S.A.* 40A:4–45 *et seq.,* Belmar has used various mechanisms to increase police protection at minimal expense. It hired more than 30 special police officers pursuant to *N.J.S.A.* 40A:14–146 to augment its regular police force. During the 1978 summer season, the Police Chief assigned unmarked police cars, manned by regular officers in plainclothes, to respond to noise complaints between 10 p. m. and 6 a. m. on Friday and Saturday. These officers volunteered for this task force and received overtime pay for the work. On some occasions the number of volunteers was insufficient.

Because of complaints about inadequate police protection, the Police Chief decided to place another police car on duty on weekend nights during the summer of 1979. Under the new summer schedule, he substituted special police for the regular police who had previously patrolled the business district. These regular police in turn were assigned to patrol car duty between Wednesday and Sunday nights to handle noise complaints.

The Police Chief chose to use regular policemen rather than specials on this anti-noise detail because regulars knew the municipal ordinances, had more experience in multiple person contact, were more familiar with arrest and booking procedures, and understood how to operate the decimeter to measure noise levels.

The major functions of the special police officers assigned to the business district were to make certain that stores and buildings were secure, to check on the diner and hotel, to investigate suspicious activity, and to make any necessary arrests. The specials were instructed to contact headquarters if they encountered a situation that they were not sure how to handle, and the sergeants on desk duty were directed to supervise the areas patrolled by specials more closely than they normally would.

It was the assignment of special police to patrol the business district in place of regular officers that triggered this lawsuit. The assignment of regular officers to the anti-noise detail as regular duty deprived them of overtime pay which they had previously received for this work. The Police Chief because of the opposition of the PBA reassigned regular officers to the business patrol. A special policeman was designated to accompany a regular officer in each patrol car on the anti-noise detail.

The PBA was concerned that the Borough might at some future time again attempt to assign special police in place of regulars.[1] However, it had no objection to a special officer

---

[1]The PBA's collective bargaining agreement provided for the use of special officers when a regular officer was unable to work a vacated post. A vacated post was defined as one where an officer has taken off because of the use of sick leave, days off from accumulated compensated time, or the use of a vacation day that is used other than during the officer's vacation time. No other reference to special officers is made in the agreement. The PBA's contention in effect was that the Borough had violated the contract by replacing regular officers stationed in the business district with specials. This being so, and no question of negotiability having been raised, the parties should have pursued the contractual grievance procedure, including arbitra-

accompanying a regular policeman on the anti-noise detail. Nor did it object to the use of special police to patrol the boardwalk or to inspect parking meters during the summer months.

Despite these concessions the trial court enjoined defendants from utilizing special police (1) to patrol the business district, (2) to accompany a regular police officer in patrol vehicles, (3) to carry weapons, handcuffs, nightsticks or slapjacks, and (4) to exercise powers of arrest beyond those accorded any other citizen.

The State has delegated to municipalities the general authority to adopt such ordinances, rules and regulations as they may deem necessary and proper for the order and protection of persons and property and for the preservation of the public health, safety and welfare, and as may be necessary to carry into effect the powers and duties conferred on the municipality by any law. *N.J.S.A.* 40:48–2. Underlying this grant of authority is the right of people in a civilized society to live free from attacks on their persons and property, one of the basic justifications for government.

The Legislature, complementing the general authority delegated to municipalities, specified that a municipality may create a police force. *N.J.S.A.* 40A:14–118. The present statute carries forward the format of the police force that appeared in a general act governing municipalities enacted in 1917. *L.* 1917, *c.* 152, Art. XVI, §§ 1, 3 and 7. The Legislature empowered municipalities to employ three types of policemen, regular, temporary and special. The 1917 act listed the following qualifications for a regular police officer: good moral character, sound in body and in good health, and the ability to read and write the English language intelligently. It also provided that municipalities could hire officers "temporarily in case of emergency or for

---

tion. However, a transfer to an arbitrator need not be considered at this stage in the proceeding in view of the existence of the individual plaintiffs who are residents and taxpayers.

parts of years, in cases where their services are not needed throughout the entire year, and discharge them at the expiration of such temporary employment."

In addition, the statute granted the municipalities authority "to appoint special policemen for a term not exceeding one year; such special policemen shall not be members of the police force and their powers, rights and duties shall immediately cease and determine at the expiration of the term for which they were appointed." Their appointments were subject to revocation at any time without cause and they could be given a badge.

These provisions concerning regular, temporary and special police have been continued substantially in the same form to the present.[2] Under *N.J.S.A.* 40A:14-146 special police may not be members of the police force; their appointments may not exceed a one-year term; they may be fired at any time without cause; and they may carry a badge. The statutory qualifications of special police are comparable to those of regular police. These include (1) citizenship, (2) ability to read, write and speak the English language, (3) physical capability, and (4) good moral character. *Compare N.J.S.A.* 40A:14-146 *with N.J.S.A.* 40A:14-122. The Chief of Police, who supervises and directs the special police, is obligated to ascertain their eligibility and qualifications before appointment. Special police may not carry a revolver or other weapon when off duty and they may perform their duties only in the municipality wherein they have been appointed, except when in fresh pursuit of any person. Further, the special police must comply with the rules and regulations governing the conduct of the regular members of the police force.

---

[2] The trial court discussed in its opinion the use of temporary police and the applicability of the Police Training Act to temporary police. The Appellate Division, disagreeing with some of the views, pointed out, and correctly so, that the status of temporary police officers is not an issue in this case. At trial the parties did not address themselves to the position of temporary police officers and no record has been made relating to them. We shall not consider their role in the police establishment.

The statutes do not state the circumstances under which a special police officer may be hired. Municipalities have been authorized to make these appointments "whenever they shall deem it necessary." *N.J.S.A.* 40A:14–146. Facially, at least, this is indicative of a broad power. However, special police are not the equivalent of regular police officers who serve on a full time basis throughout the year and from year to year. The special has a more limited role, one restricted in time or function or both.

The inference that a special police officer may be authorized to carry a weapon is irresistible when consideration is given to the provision in *N.J.S.A.* 40A:14–146 that "[n]o special policeman shall carry a revolver or other similar weapon when off duty." Any other assumption would render this language meaningless. *See McGlynn v. New Jersey Public Broadcasting Authority*, 88 *N.J.* 112 (1981). Moreover, a special police officer, when authorized by the municipality, is exempted from the provision governing unlawful possession of weapons under the new Code of Criminal Justice. *N.J.S.A.* 2C:39–6 a(7). His use of a weapon and his authority to make arrests as a police officer are confirmed by the statutory reference in *N.J.S.A.* 40A:14–146 to his inclusion as a peace officer under the Uniform Act on Intrastate Fresh Pursuit, *N.J.S.A.* 2A:156–1 *et seq.* (saved from repeal by *N.J.S.A.* 2C:98–3). The Uniform Act authorizes an officer to pursue and arrest a person reasonably believed by him to have committed a high misdemeanor or to have attempted to commit any such offense. This power of arrest exceeds that with which a citizen is endowed. *See State v. Smith*, 37 *N.J.* 481, 494–95 (1962). So, from a statutory standpoint, a municipality may authorize special police to carry weapons and make arrests as other police officers.

Further support for this proposition is found in other legislation wherein special police have been empowered to make arrests. Associations, holding agricultural fairs and exhibitions, have police jurisdiction on and adjacent to their grounds. *N.J.*

*S.A.* 4:15–3. These associations may appoint special police who are authorized to arrest all persons who violate any state laws, or conduct themselves in a disorderly manner, or wrongfully interfere with the fair or visitors or violate any rules or regulations of the association. *N.J.S.A.* 4:15–5. The special police also have the powers vested in constables in criminal cases. A statute governing fairs held by owners of stud farms provides for comparable arresting powers in special police. *N.J.S.A.* 4:15–6 to –9.

The Commissioner of the Department of Human Services, with the approval of the Attorney General, may appoint "as many special policemen for each State institution as he may consider necessary." *N.J.S.A.* 30:4–14. It is the policeman's duty to "preserve order in and about the institution with power to arrest and hold any offender against the public peace within the limits of his commission." *Id.* These special police "shall have the same powers as a . . . police officer of a city in criminal cases." *Id.*

These statutes evince a legislative awareness that special police may have the same powers as regular police. By expressly limiting the special police officer's authority in certain respects, such as not permitting the carrying of a weapon while off duty, the Legislature in all probability intended that the officer could be authorized to have all the residual authority of a regular officer.

Special police have been used for many years to carry on the full panoply of police functions during limited periods. As early as 1837, the Newark City Council passed an ordinance authorizing the Mayor to appoint special police to aid on occasions when necessary to preserve the peace and good order and to increase the public security and protection of the citizens. *Charter of the City of Newark with the Ordinances and By-laws passed by the Common Council* 107 (1838). When Newark created its police department in 1857, the Mayor retained this power to appoint special police for temporary duty as necessary

to preserve peace and order. Thus the Mayor of Newark in 1864 and 1866 appointed special police to act in concert with the regular police on election day. He appointed 40 special police to maintain peace during a railroad strike in 1877. *The History of the Police Department of Newark* 63, 93 (1893). In 1897, the Legislature granted all mayors of cities having fewer than 12,000 inhabitants the authority to appoint "such special policemen as he may deem necessary" to preserve the peace and good order. *L.* 1897, *c.* 30, § 25.

Employment of special police has not been limited to instances in which the demand for additional police arose suddenly and unexpectedly. Special police have been used to supplement the regular force during summer months in seashore communities since as long ago as 1885. Reference is made to that practice in *Clark v. Cape May*, 50 *N.J.L.* 558 (Sup.Ct.1888). The court observed there that the City of Cape May had "a large and constantly changing population composed of those who [came] to this city for business, health or recreation, and there [was] more need for protection and watchfulness at that season...." The City therefore engaged three "special officers, in addition to the regular police force, to preserve order." *Id.* at 561.

In *Caronia v. Civil Service Comm'n. of N.J.*, 6 *N.J.Super.* 275 (App.Div.1950), special police were used on a non-emergency basis. They gathered the children together at the crossing and escorted them across the street at the beginning of the morning school session, at noontime, and at the conclusions of classes in the afternoon. The police carried no clubs, revolvers, or other accessories and wore no uniforms, but did display a police badge. The Court held that this was a "limited and special duty" that under *R.S.* 40:47–19 (current version at *N.J.S.A.* 40A:14–146) could be entrusted to special police. *Id.* at 282.

The use of special police has continued to date. A statewide survey in 1976 disclosed that three out of every four police departments employ special police. This long continued interpretation, without legislative change, by municipalities of statu-

tory authority governing special police officers, supports a finding of legislative intent to vest the authority exercised in municipalities. *City of Clifton v. North Jersey District Water Supply Comm'n.*, 104 *N.J.Super.* 147 (App.Div.1969); *Solomon v. Newark*, 137 *N.J.L.* 247 (Sup.Ct.1948). Moreover, this interpretation is in accord with the constitutional admonition that laws "concerning municipal corporations ... shall be liberally construed in their favor." *N.J.Const.* (1947), Art. IV, § VII, par. 11.

■ Respondents contend that the Legislature intended that special police be given very limited authority because *N.J.S.A.* 40A:14–146 as well as the predecessor statutes provided that they "shall not be members of the police force." · However, this provision concerns job security and pensions, elements reserved for regular police who can be removed only for cause. *See N.J.S.A.* 40A:14–147. Further, to interpret the phrase so as to exclude special police completely from the police force would conflict with the proviso that special police "shall be under the supervision and direction of the chief of police" and "shall comply with the rules and regulations applicable to the conduct and decorum of the regular policemen." *N.J.S.A.* 40A:14–146.

Respondents urge that authorization of a special police officer to perform the same duties as a regular officer, particularly in carrying weapons and making arrests, is dangerous and unwise. They direct us to the Police Training Act, which requires that a municipality may not make a permanent appointment of a police officer unless such person has completed a satisfactory police training course. *N.J.S.A.* 52:17B–68. That Act recognizes the need for "proper educational and clinical training" of those "who seek to become permanent law enforcement officers." *N.J.S.A.* 52:17B–66. The Police Training Commission, of which the Attorney General is chairman, is vested with power to prescribe standards for police training schools and the courses given therein and to certify police officers who have satisfactorily completed training programs. *N.J.S.A.* 52:17B–70. It has

promulgated regulations for those purposes. *N.J.A.C.* 12:1–1.1 to –8.3.

Respondents argue that it is incongruous to permit special policemen to exercise the same duties without having received the same training. It should be noted, however, that police serving a probationary period preceding appointment as regular police officers can perform regular police duties for periods up to 18 months prior to enrolling in the training course. *N.J.S.A.* 52:17B–69. It also appears that "temporary" police officers who are members of the police department are not subject to the Police Training Act. The Act defines a "policeman" as any permanent full time active member of a police force. *N.J.S.A.* 52:17B–71.3. See *N.J.S.A.* 52:17B–67. As originally enacted in 1961, the Act included temporary police. When the Act was amended in 1965, reference to inclusion of temporary appointees was deleted. *Compare L.* 1961, *c.* 56, § 3 *with L.* 1965, *c.* 8, § 2 (current version at *N.J.S.A.* 52:17B–68).

Despite the recommendations of the Police Training Commission and the Attorney General, the Legislature has rejected attempts to extend the Police Training Act to special police, leaving the training responsibility with each municipality. See Assembly No. 583 (1972); Assembly No. 661 (1974); Assembly No. 116 (1976); Assembly No. 1248 (1978); Assembly No. 1117 (1980). Each municipality must decide what training is to be given to a special police officer. Since the particular tasks for special police may vary widely, the Legislature has relied on the municipality's judgment to fix the amount and type of training needed. It is clear, however, that municipalities have a duty to train special officers so that they may properly perform their assigned duties.

Municipalities do not have any uniform guidelines or standards governing police training. As a result there is great variation in the instruction given to special police. A 1969 survey by the Police Training Commission stated that 541 municipalities employed 4,744 special police. Fifty-seven of those

municipalities had no regular police force. A number of municipalities had no structured training programs. No training was given to 489 specials and fewer than 20 hours of instruction to 567 officers. Belmar, for example, requires completion of 26 hours of classroom instruction. The subject matter covers arrests, search and seizure, use of warrants, *Miranda* warnings, Borough ordinances, traffic control, motor vehicle accident reports, handling of evidence, police practice and procedure, first aid and drugs. The applicants are not required to pass any examination or test upon completion of the courses. Up to four hours of instruction is given on the pistol range.

Related to the municipality's obligation to train special police adequately for their appointed jobs is its duty to the public. In *McAndrew v. Mularchuk*, 33 *N.J.* 172, 184 (1960), we emphasized a municipality's obligation "to use care commensurate with the risk to see to it that [special police] are adequately trained or experienced in the proper handling and use of the weapons they are to carry." This duty extends well beyond instruction in the use of firearms, for there may be an exposure to an equal risk of danger from other types of police activity. An individual suffers when unlawfully arrested and detained. The public suffers when evidence is illegally seized, leading to the inadmissibility of crucial evidence and dismissal of the charges. Failure to quell a disturbance can lead to riot, injury and death and substantial property damage. It is obvious that training and instruction may involve many matters more intricate than the handling of a gun.

The type and amount of training needed will depend upon the duties to be assigned. The school crossing guard's functions are substantially dissimilar from those of an officer who is patrolling a crowded beach and boardwalk. It is perhaps because of the diversity in tasks that the extent and intensity of training is left to the municipality under our present statutory scheme. Presumably, it will exercise that judgment wisely; keeping in mind the nature of the work to which the special police will be assigned and structuring the amount of instruction accordingly.

The public appearance of the special police officers resembles that of regular officers. They are authorized to wear a badge and, as in Belmar, have a similar uniform. Accordingly, the public has a right to expect that they will carry out the responsibilities of police officers in a capable manner. If a municipality vests a special officer with the same responsibility as a regular officer, as Belmar has apparently done as indicated in its police department's rules and regulations, the municipality would do well to require the same or similar training envisaged under the Police Training Act.

Plaintiffs have relied substantially upon the Attorney General's Formal Opinion No. 22 (1977), in which he stated that the legislative intent was to use special police officers to provide intermittent or temporary assistance to the regular police force during unusual or emergency circumstances. The underpinning of his opinion on legislative intent was some conclusory language by a trial court in *State v. Jones*, 4 *N.J.Super.* 599 (Law Div.1949), *rev'd on other grounds*, 4 *N.J.* 207 (1950), and on the exclusion of special police from civil service, *N.J.S.A.* 11:22–2(q), and on the failure to include special police under the Police Training Act, *N.J.S.A.* 52:17B–66 *et seq.*

However, the Attorney General did sanction use of special police under some predictable circumstances that necessitated extraordinary temporary assistance," such as the use of special police during the summer at a resort community to handle the seasonal influx of visitors, to direct heavy traffic and handle large crowds at regularly scheduled sporting events and rock concerts." The opinion concluded that a special police officer should not be appointed "to perform the regular responsibilities of a municipal police department on a continuous basis or on a full or part-time basis," including police dispatching and routine traffic and crowd control. The Attorney General supplemented that opinion on January 13, 1978, holding that special police officers could not be assigned "on a regular basis to perform the routine duties of traffic control at school crossings or as a police radio dispatcher."

The Attorney General next published responses, dated August 1, 1978, to numerous inquiries by county and municipal officials. *Responses to Inquiries by County and Municipal Officials Concerning Implementation and Application of the Special Police Opinion.* He stated that special police officers could be used as school crossing guards, as municipal court attendants, as guards in banks, and as dispatchers under unusual or emergent circumstances, and that special police could be used at polling places during primary and general elections. In his brief before us the Attorney General modified his position by limiting use of special police to "a sudden, unexpected and critical emergency."

These shifting opinions did not expressly reflect any consideration of the extensive history and usage of special officers, of the Appellate Division opinion in *Caronia v. Civil Service Comm'n., supra,* or of the time frame differential between the statute governing special police, *N.J.S.A.* 40A:14–146 (*L.* 1971, *c.* 197, § 1, originally enacted as *L.* 1917, *c.* 152, § 7), and the Police Training Act, *N.J.S.A.* 52:17B–66 *et seq.,* originally enacted as *L.* 1961, *c.* 56). We do not find the opinions persuasive. The failure to include special police under the Police Training Act did not result in repeal of the municipality's authority to arm special police with weapons or to authorize them to make arrests. Rather, the Legislature left the status of special police unimpaired. The Attorney General agrees that special police may carry weapons while on duty and may make arrests. That being so, there is no reason to limit the use of special police in the manner he suggests. What is vital is that the special police be capable of handling a firearm, be instilled with sound judgment, and be knowledgeable about proper police procedures and techniques.

As indicated previously, there may be occasions when special police officers may properly work full-time, part-time, or on a continuous basis. They may be designated to perform some or all of the same duties as the regular police. They may be authorized to carry weapons and to make arrests. Their ap-

pointments may not exceed one year and they may be discharged at any time without cause. However, special police may not be employed on a full time annual basis as a subterfuge to avoid hiring regular police, though they may be employed part-time to supplement the regular police force—the part-time consisting of a day or a segment of the year. More appropriately, special police should be used for emergencies, both anticipated and unexpected. They can be used as well to supplement or augment the regular force during the summer crunch at the seashore or on a particular weekday night when stores regularly remain open for shopping. Generally they should be assigned when feasible to less sensitive areas. The pattern of employment of special police should fall within this general framework, subject of course to the individual having received satisfactory training for the function to be performed. It is the obligation of the municipalities to see to it that the special policemen are qualified for their job.

The judgment is reversed and the complaint dismissed. No costs.

*For reversal*—Chief Justice WILENTZ, and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For affirmance*—None.