623 A.2d 1366

515 ASSOCIATES, A NEW JERSEY LIMITED PARTNERSHIP; 402 ASSOCIATES, A NEW JERSEY LIMITED PARTNERSHIP; 555 ASSOCIATES, A NEW JERSEY LIMITED PARTNERSHIP; 380 ASSOCIATES, A NEW JERSEY LIMITED PARTNERSHIP; PAVILION PROPERTIES, LTD., A CALIFORNIA LIMITED PARTNERSHIP; HALLMARK PROPERTIES, LTD., A CALIFORNIA LIMITED PARTNERSHIP; COLONNADE APARTMENTS, LTD., A DISTRICT OF COLUMBIA LIMITED PARTNERSHIP; AND ASCOT MANAGEMENT CORP., A NEW YORK CORPORATION, PLAINTIFFS–APPELLANTS, AND PRASAD CHALASANI, M.D., PLAINTIFF, v. CITY OF NEWARK, A MUNICIPAL CORPORATION·OF THE STATE OF NEW JERSEY, AND MAYOR AND COUNCIL OF THE CITY OF NEWARK, DEFENDANTS–RESPONDENTS.

Argued January 20, 1993—Decided May 13, 1993.

*Sheppard A. Guryan* argued the cause for appellants (*Lasser, Hochman, Marcus, Guryan and Kuskin,* attorneys; *Bruce H. Snyder,* on the brief).

*Hugh B. Gallagher* argued the cause for respondents (*Michelle Hollar–Gregory,* Corporation Counsel, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

We granted certification, 130 *N.J.* 394, 614 *A.*2d 617 (1992), to review the Appellate Division's judgment upholding an ordinance of the City of Newark that requires certain private-property owners to provide armed security guards on their premises eight hours each day. Because of the broad sweep of

the municipal police power in this state and because the legislative history of the ordinance contains sufficient evidence to withstand an attack that the ordinance is an unreasonable exercise of that power, we hold that imposition of such a requirement was within the City's power. Therefore, we affirm.

I

In October 1991, the City Council of Newark adopted the following ordinance:

*Armed Security Guard Required.* Except as is otherwise herein provided all public and private housing buildings in the City of Newark, New Jersey, which contain over 100 housing units shall be required to have present on the premises an armed security guard for eight of every twenty-four hours, as well as an unarmed security guard for the remaining 16 hours, during each day of a year. Housing units which are situated on the grounds of hospitals, regularly patrolled by a security force, and wherein such grounds are revisited by a security patrol at least once per hour, shall be exempt from the requirement of maintaining an armed security guard on the premises. The provisions of this section shall not apply to any dwelling unit which is a condominium development or any rental or condominium building with units each having an individual exterior entrance.

That ordinance represents the final form of an earlier-enacted ordinance that required twenty-four-hour armed security for buildings with more than seventy-five units. The Council amended the original ordinance in order to lessen its financial burden on building owners. Plaintiffs, owners of certain apartment buildings in Newark affected by the ordinance, filed a complaint in lieu of prerogative writ, challenging the ordinance as originally enacted. The trial court upheld the City's actions as within the municipal police power.

Plaintiffs appealed, and the Appellate Division affirmed, substantially adopting the trial court's analysis. Because the City had amended the ordinance, adding the exemption for certain condominium and rental developments, the Appellate Division considered a slightly different version of the ordinance from the one that the trial court had considered.

In their attack on the ordinance in this Court, plaintiffs offer several arguments based on the New Jersey Constitution and our prior case law. In addressing those arguments, we are mindful of the limitations on our power to review the City's action. Our role is not to review the merits of the legislation, nor to decide whether the ordinance will eradicate crime in high-rise apartments in Newark, nor to decide if Newark has chosen the most effective method of reducing the crime rate in the vicinity of the buildings regulated by the ordinance. Our sole function is to evaluate the City's actions in light of the salient constitutional provisions and established precedent. With that focus established, we turn now to plaintiffs' arguments.

## II

First, plaintiffs challenge the City's action as an arbitrary and unreasonable exercise of the municipal police power. Municipalities may enact ordinances pursuant to the police power, *Hutton Park Gardens v. West Orange Town Council,* 68 *N.J.* 543, 564, 350 *A.*2d 1 (1975); *N.J.S.A.* 40:48–2, but police-power legislation is subject to the constitutional limitation that it be not unreasonable, arbitrary, or capricious, and that the means selected by the legislative body shall have real and substantial relation to the object sought to be attained, *Bonito v. Bloomfield Township,* 197 *N.J.Super.* 390, 398, 484 *A.*2d 1319 (Law Div.1984).

A plaintiff attacking an ordinance as arbitrary or unreasonable bears a heavy burden. *First People's Bank v. Medford Township,* 126 *N.J.* 413, 418, 599 *A.*2d 1248 (1991). Article IV, section VII, paragraph 11 of the New Jersey Constitution provides that "any law concerning municipal corporations formed for local government * * * shall be liberally construed in their favor." In addition, the City of Newark is chartered under the Optional Municipal Charter Law, *N.J.S.A.* 40:69A–1 to –210, which notes that "[t]he general grant of municipal power contained in this article is intended to confer the greatest

power of local self-government consistent with the Constitution of this State." *N.J.S.A.* 40:69A–30. We have previously construed the Optional Municipal Charter Law to provide powers additional to the general police power conferred in *N.J.S.A.* 40:48–2. *See Hudson Circle Servicenter, Inc. v. Kearny*, 70 *N.J.* 289, 298, 359 *A.*2d 862 (1976).

In *Hutton Park, supra*, we noted that

[l]egislative bodies are presumed to act on the basis of adequate factual support and, absent a sufficient showing to the contrary, it will be assumed that their enactments rest upon some rational basis within their knowledge and experience. This presumption can be overcome only by proofs that preclude the possibility that there could have been any set of facts known to the legislative body * * * [that] would rationally support a conclusion that the enactment is in the public interest.

[68 *N.J.* at 564–65, 350 *A.*2d 1 (citations omitted).]

A plaintiff can overcome that presumption of validity only by a clear showing that an ordinance is arbitrary or unreasonable. *Hudson Circle Servicenter, supra*, 70 *N.J.* at 299, 359 *A.*2d 862. Plaintiffs have not made that required showing.

During hearings on the ordinance, several Council members and citizens spoke about the special circumstances and dangers presented by multiple dwellings like the plaintiffs' buildings. For instance, one witness said, "I would ask that the Council support [the ordinance], but one thing that troubles me about this ordinance, which I think is necessary because *we do need armed security guards and doormen*, is that there is no penalty [for violation of the ordinance] * * *." (Emphasis added). A Newark landlord who testified against the ordinance nevertheless said, "I have at times gotten out of my car myself to chase people when I saw someone getting robbed in the street" near a large apartment building in Newark. Another Newark resident recounted two instances in which persons had "shot up" the high-rise apartment in which she resided.

Councilman Grant noted that "a number of high-rise buildings in this City * * * are just not protected[,] and people are walking in and out at their own risks[,] and in some instances,

they walk out and don't come back because of molestation."
He also said, "People are calling and complaining to us, 'I live
in a high rise. We have no protection. There are attendants
sitting there and they are powerless to do anything.' "

Other Council members also expressed support for the ordi-
nance. For instance, Councilman Ronald Rice said:

[A]rmed security is very effective at a high-rise entrances [sic], but it is just as
much effective if not more so in those open spaces, whether it is private,
whether it is Stephen Crane, Bradley Court, Hawkins, Roanoke, etc., or even a
high-rise with a big court, because the hope is that one does not encounter a
problem, but one deters a problem by his mere presence. I can say this to you,
from my background in security management and criminal justice, and I have
taught this stuff, that is what my degree is in, is that without armed security as
some of those locations are, could not deter[.] [I]n fact, the mere presence of
an unarmed guard there invites—you'll be surprised.

Councilman Tucker spoke of "tenants who are crying for and
deserve police protection or armed-guard protection within their
buildings."

The Council provided the trial court with crime statistics for
plaintiffs' properties and the areas immediately adjacent to
those properties for the period between January 1989 and
September 1990. The Council concedes that it did not have
those figures before it when it considered the ordinance origi-
nally. Those statistics nevertheless do not lose their evidentia-
ry value in respect of the reasonableness of the Council's belief
that plaintiffs' properties presented a greater-than-usual threat
to public safety. Those statistics reveal that the following
crimes had been reported for those properties during that
twenty-month period: fifty-two assaults, forty-two robberies,
five rapes, and one murder. Plaintiffs point to the City's
failure to contrast the *per capita* crime rate for their properties
with the rates for other areas of the City. However, that
observation ignores the fact that the higher population density
of the regulated properties might alone justify a distinction.

Faced with the same information and experience as the
Council, we might not conclude that large apartment buildings
are peculiarly dangerous or that armed security is necessary,

but we repeat: we are not free to substitute our judgment for the Council's. The anecdotal evidence offered by citizens and the Council's knowledge and experience, including Councilman Rice's background in law enforcement, supply a rational basis for the City's action because a reasonable person faced with the same evidence could conclude that large multiple dwellings present special security problems. Therefore, we are satisfied that the Council did not act arbitrarily or capriciously.

### III

Next, plaintiffs challenge the ordinance as an improper attempt by the municipality to delegate its governmental duty to provide police protection. Without doubt, local governments bear the burden of providing police protection, and they may not transfer that duty to private citizens. Nevertheless, we have recognized in the past that under special circumstances municipalities may require that private parties provide assistance in the police-protection area. Because we do not perceive the requirement of armed security guards in the affected properties as constituting a wholesale transfer of the duty to provide police protection, but rather as representing a valid delegation of some portion of that duty—a delegation justified by the facts supporting the City's call for assistance—we reject plaintiffs' argument.

Undoubtedly, the duties of the guards envisioned in the Newark ordinance far exceed those that have previously received the approval of our courts. In the past, the courts have upheld an ordinance that required twenty-four-hour security services at a truck stop, *Hudson Circle Servicenter, supra,* 70 *N.J.* 289, 359 *A.*2d 862; an ordinance requiring a uniformed security guard during certain hours at apartment complexes of 250 or more units, *Sunrise Village Assocs. v. Borough of Roselle Park,* 181 *N.J.Super.* 567, 438 *A.*2d 945 (Law Div.1980), *aff'd,* 181 *N.J.Super.* 565, 438 *A.*2d 944 (App.Div.1981), *certif. denied,* 89 *N.J.* 413, 446 *A.*2d 144 (1982); and an ordinance

requiring security guards at an arcade, *Bonito, supra,* 197 *N.J.Super.* 390, 484 *A.*2d 1319. Those cases inform our resolution of the present case.

In *Hudson Circle Servicenter, supra,* 70 *N.J.* 289, 359 *A.*2d 862, we held that although a municipality may not make a wholesale transfer of the duty to protect citizens from crime, it may call on private citizens to provide assistance in the performance of that duty. In that case the crime in the area consisted of numerous thefts, five major altercations, eighteen accidental injuries to truck drivers using the facility, and at least three armed robberies. In addition, three runaways had been found there, a fugitive had been apprehended there, sixteen women had been arrested for prostitution or failing to give a good account of themselves, eighteen rubbish fires had occurred at or near the site, and one major fire of unknown origin had caused extensive damage to a tractor trailer. *Id.* at 296–97, 359 *A.*2d 862. We therefore said:

> In light of our factual findings disclosing the need for this ordinance and given the presumption favoring municipal enactments, it is clear that Kearny's ordinance is reasonable under the circumstances. * * * [W]e note that Kearny has not relinquished its public duty to provide police protection. Rather, it has merely called upon plaintiff to provide assistance in the performance of that duty, such assistance clearly justified by the amount of crime occurring in the area.

> [*Id.* at 310 n. 14, 359 *A.*2d 862 (citation omitted).]

Admittedly, the Court in *Hudson Circle Servicenter* envisioned a limited role for the security guards. The Court distinguished the services required by the ordinance in that case from police functions by noting that the ordinance did not "require that the uniformed guard undertake the *duties of the police department in investigating crimes and apprehending and prosecuting criminal offenders." Ibid.* (emphasis added). The purpose of the guards was to deter criminal conduct, prevent unauthorized persons or vehicles from entering the lot, direct traffic, and report the activities of suspicious persons to the police. *Ibid.*

The next case to consider a security-guard requirement, *Sunrise Village Associates, supra,* 181 *N.J.Super.* 567, 438 *A.*2d 945, upheld an ordinance that required an owner of any apartment complex with 250 or more units to provide uniformed-security-guard services on the premises during certain hours. The ordinance also required the guards to "undertake all actions necessary to assure the personal safety, privacy and protection of property of the residents of each apartment complex and their guests." *Id.* at 571, 438 *A.*2d 945. A local apartment owner objected, claiming that the ordinance improperly required him to maintain a private police force and that only the government, not private landlords, had the duty to provide such protection. In rejecting that argument, the Appellate Division said:

> It is important to note that the municipality is not foregoing its governmental duty concerning police protection, nor is it transferring this duty to plaintiff. *The security guards required are not empowered with the authority of municipal police, nor are they empowered to arrest and detain, carry weapons or otherwise intervene.* Their presence, however, could serve to decrease the occurrence of police responses and increase law and order in the area by serving as a deterrent factor. A security [sic] may also result in quicker police response and increase the chances to apprehend those responsible for breaking the law.

> [*Id.* at 573 (emphasis added), 438 A.2d 945.]

Although our dissenting colleagues seize on the "carry weapons" part of the foregoing, *post* at 202, 623 *A.*2d at 1377, we note that that factor is neither the sole nor first consideration in the decision whether the security-guard duties constitute police duties.

Finally, in *Bonito, supra,* 197 *N.J.Super.* 390, 484 *A.*2d 1319, the Law Division upheld as a proper exercise of police power a requirement that arcades employ a security guard at especially busy times of operation. However, the court struck down the portion of the ordinance that required arcade owners to employ only off-duty police officers as security guards, holding that "[t]o limit security personnel only to off-duty police officers is so restrictive as to lack any reasonableness or relationship to

the problem sought to be resolved by the township." *Id.* at 405, 484 *A.*2d 1319. The court noted further:

> There are no facts in the record to justify such a limitation to off-duty police officers; there is no history of violence or any kind of disturbances at plaintiff's premises where the services of a police officer would be required. While an attendant may be helpful in preventing loitering, truancy, in deterring bicycle thefts and in crowd control, the presence of a police officer is a totally unnecessary burden on a video arcade owner.
>
> If the purpose of a supervisor is as indicated in the preamble (*i.e.,* to prevent gambling, loitering and truancy) any responsible adult should be capable of supervising the activities which obviously take place within a relatively small area. In addition, there has been no evidence whatsoever submitted that there is any need for the supervisor to be armed with a gun.

[*Id.* at 405–06, 484 *A.*2d 1319.]

In the present case, although the guards' functions involve certain duties traditionally performed by police officers, the guards do not perform several critical police functions that this State's courts had identified in the cases discussed above. One reason supporting the passage of this ordinance was the Council's belief that the presence of an armed security guard would deter crime. Councilman Rice, for instance, noted that "armed security is very effective as a deterrent." Nevertheless, that the Council also anticipated that the armed guards would perform certain functions identified as "police functions" in *Hudson Circle Servicenter* and *Sunrise Village Associates* seems clear. Those two cases listed the following as "police" functions: (1) investigating crimes, (2) apprehending and prosecuting criminals, (3) carrying weapons, and (4) intervening in criminal activities. *Sunrise Village Associates* also observed that the security guards were not "empowered with the authority of municipal police," without, however, explaining what authority that phrase contemplates. Nevertheless, Newark's ordinance does not explicitly attempt to vest the armed security guards with the powers of municipal police.

A reading of the Council's discussion of the understood functions of the required armed guards demonstrates that the Council believed that the guards would perform duties beyond

the mere deterrence function envisioned in the earlier security-guard cases. Of the four functions identified in *Hudson Circle Servicenter* and *Sunrise Village Associates*, the Council clearly envisioned that the armed guards would perform two—carrying weapons and intervening in potential crimes or crimes in progress.

Nothing in the ordinance or its legislative history suggests that the guards would have the authority to investigate crimes or apprehend and prosecute offenders. That responsibility—which is an indispensable part of the police officer's function—is not part of the security guards' duties. If an armed security guard should intervene to prevent or stop a crime, the guard would have no duty to investigate or take steps to secure the criminal's arrest beyond those of an ordinary citizen. Police officers have also the right to engage in other law-enforcement activities that security guards do not, such as conducting investigative detention or warrantless searches in appropriate circumstances. Therefore, although the duties of these guards approach the line dividing security services from police services, we are fully satisfied that they do not cross that line.

Plaintiffs' and our dissenting colleagues' arguments that the City has delegated the duty of providing police protection come down to this assertion: when you give a security guard a gun, that security guard becomes a police officer. But police officers are more than security guards with guns. We do not make light of the ordinance's requirement that security guards carry a weapon, but we emphasize that police protection involves a myriad of responsibilities. Even a requirement that a person perform some task or tasks similar to those undertaken by a police officer—even one as identified with police duties as carrying a weapon—does not transform that person into a police officer.

The requirement of an armed security guard for plaintiffs' buildings in no way constitutes an abdication of the City's own duties; rather, it manifests a rational legislative determination

that a certain class of buildings poses special risks of crime and that the municipal police alone cannot possibly deal with all the crime in the City in a timely manner.

## IV

■ Plaintiffs contend that the standard for issuance of a handgun permit to security personnel set forth in *In re Preis*, 118 *N.J.* 564, 573 *A.*2d 148 (1990), will allow no one other than police officers to qualify for a permit, and therefore apartment owners will have to hire off-duty police officers to serve as the armed security guards required by the ordinance. Plaintiffs believe that such a requirement would contradict the holding in *Bonito, supra*, 197 *N.J.Super.* 390, 484 *A.*2d 1319, which held that Bloomfield Township could not require video arcades to employ only off-duty police officers as security guards.

In *Preis*, the Court held that employees of security agencies, like other handgun-permit applicants, must demonstrate "justifiable need" for a handgun as required by *N.J.S.A.* 2C:58–4(c). The security-agency employees in *Preis* sought permits so that they could provide security for executive officers of a tugboat company that was involved in a labor dispute. During that dispute, an unknown person had shot out a tugboat window. The Law Division denied the applications, holding that the applicants had not shown "evidence of any great need of armed guards" and that an executive had no greater right to armed protection "just because he or she happens to be 'an important person or executive.'" 118 *N.J.* at 567–68, 573 *A.*2d 148. On the applicants' appeal the Appellate Division reversed. On the State's appeal from that judgment we reversed and reinstated the trial court's judgment denying the permit applications. *Id.* at 577, 573 *A.*2d 148.

*Preis* noted that New Jersey's gun-control laws are a " 'careful grid' of regulatory provisions." *Id.* at 568, 573 *A.*2d 148 (quoting *State v. Ingram*, 98 *N.J.* 489, 495 n. 1, 488 *A.*2d 545 (1985)). We considered the issue to be "whether the policy

\* \* \* in favor of issuing permits to persons employed in security work justifies the generalized issuance of a permit without demonstrable need to carry guns for self-protection from dangers either to self or to others." *Id.*, 118 *N.J.* at 571, 573 *A.*2d 148.

The Court answered that question in the negative. Under *Preis,* before issuing a handgun permit to an employee of a security agency a court must determine (1) that the applicant, in the course of performing statutorily-authorized duties, is subject to a substantial threat of serious bodily harm, and (2) that carrying a handgun is necessary to reduce the threat of unjustifiable serious bodily harm to any person. *Id.* at 576–77, 573 *A.*2d 148.

Plaintiffs point to a variety of cases in which courts have denied handgun permits as evidence of the difficulty in securing such a permit. See *Reilly v. State,* 59 *N.J.* 559, 284 *A.*2d 541 (1971) (holding that physicians required to carry narcotics in high-crime areas were not entitled to receive permit); *Siccardi v. State,* 59 *N.J.* 545, 284 *A.*2d 533 (1971) (denying handgun permit for theater manager required to carry substantial sums of money from theater to nearby bank depository in late-evening hours in high-crime area); *In re Application of "X",* 59 *N.J.* 533, 284 *A.*2d 530 (1971) (denying handgun permits for diamond dealer and salesman who carried loose diamonds); *Doe v. Dover Township,* 216 *N.J.Super.* 539, 524 *A.*2d 469 (App.Div. 1987) (holding person in jewelry business who carried large sums of money and jewelry between places of business was not entitled to permit).

Of course, those cases were decided before *Preis,* and they involved weaker claims for permits than the claims of the *Preis* applicants. In *Reilly,* none of the doctors involved introduced any evidence of recent attacks that involved substantial threat of injury. One doctor claimed that seven or eight years previously several young assailants backed him up against a wall but had left him alone because a police car had driven past.

Another doctor claimed that several persons with broomstick handles had followed him to his car and had fled when he pulled a gun in an incident in New York City. In *Siccardi* the theater owner did not relate a single attack on him or his family members in the thirty-five years that they had owned the theater. He claimed need because of incidents elsewhere in the city. In *In re Application of "X"* the diamond dealer lived in an area relatively free of crime, and he claimed no incidents that showed any special danger to him. Similarly, in *Doe* the applicant's sole basis for his request was the fact that he carried large sums of money and jewelry. He claimed no special danger and claimed no previous threats to his safety.

Furthermore—and most important—none of those cases involved a person performing statutorily-authorized duties. *Preis* did not hold that employees of security agencies could not obtain handgun permits; it said merely that an applicant who worked for a security agency would receive no preferential treatment. As the Court pointed out:

We would not say that a permit could not be issued to security agents in particular cases or situations, but we cannot agree that the Legislature would intend that authorization to be self-executing. That would make the private-security agency a judge of its own permits.

[118 *N.J.* at 575, 573 *A.*2d 148.]

The security guards applying for permits under the Newark ordinance have a strong claim. First, carrying a handgun is necessary to reduce the threat of unjustifiable serious bodily harm to themselves and others in light of the governing body's findings that such protection is necessary in certain buildings in the City. Second, because the ordinance in question was passed under *N.J.S.A.* 40:48–2, which permits municipalities to enact ordinances in support of the police power, the guards would be performing statutorily-authorized duties. For those reasons, plaintiffs probably need not hire only off-duty police officers for the armed-security-guard positions.

Plaintiffs and the dissent, see *post* at 200–01, 623 *A.*2d at 1376–77, contend that our decision in *Preis* is undermined by judicial acceptance of the ordinance. *Preis* reflects a desire to put handguns in the hands of only those persons who have demonstrated clearly a need for such a weapon for protection. Our decision today is entirely consistent with that concept: the ordinance does not permit issuance of a permit to any person who has not satisfied the stringent standards set out in *Preis*. Although one might be distressed that so many persons in Newark may be able to demonstrate justifiable need for armed protection, that regrettable circumstance does not allow a departure from the standard we announced only recently in *Preis*. By today's decision we do not undercut or retreat from the *Preis* holding.

Furthermore, the eventuality that off-duty police officers will constitute the vast majority of armed security guards does not require that the Court strike down the ordinance. *Bonito, supra,* held that requiring off-duty police officers to supervise an arcade in order to prevent bicycle theft, truancy, and gambling lacked any rational basis. The decision observed that no rational basis existed for that requirement, asking, "[A]re off-duty police, rookie or otherwise, more competent to act as security guards than, say, Wells Fargo guards, Pinkerton guards, Wackenhut guards, constables, corrections officers, sheriff's officers or even *retired* policemen?" 197 *N.J.Super.* at 404, 484 *A.*2d 1319. The court noted further that "there is no history of violence or any kind of disturbances at plaintiff's premises where the services of a police officer would be required * * *." *Id.* at 405, 484 *A.*2d 1319. It also said, "there has been no evidence whatsoever submitted that there is any need for the supervisor to be armed with a gun." *Id.* at 406, 484 *A.*2d 1319. In short, *Bonito* found it irrational to require off-duty police officers to guard against bicycle theft, truancy, and gambling.

Nevertheless, in a case involving the threat of violence, the requirement of an off-duty police officer is hardly irrational.

Because of the rate of violent crime in Newark, even an express requirement that apartment owners use only off-duty police officers might withstand scrutiny. The ordinance seeks to prevent assaults, rapes, and robberies rather than truancy, bicycle theft, and gambling. Requiring off-duty police officers for those tasks is not clearly irrational. Therefore, even if the ordinance does indirectly require the use of primarily off-duty police officers, we do not consider such a requirement arbitrary or unreasonable.

## V

■ Finally, plaintiffs claim that the ordinance violates the Equal Protection Clause because it irrationally singles out certain buildings for exemption from the ordinance. Once again, the strong presumption in favor of the ordinance and the legislative history lead to a finding that the distinctions are not irrational.

■ Equal protection requires that the exercise of the police power "be wholly free of unreason and arbitrariness, and that the means selected for the realization of the policy bear a real and substantial relation to that end." *Roselle v. Wright,* 21 *N.J.* 400, 409–10, 122 *A.*2d 506 (1956). Unless the government action involves a suspect classification or a fundamental right—which the action in this case does not—the party objecting to it bears the burden of showing that it lacks a rational basis. *Taxpayers Ass'n of Weymouth Township v. Weymouth Township,* 80 *N.J.* 6, 37, 364 *A.*2d 1016 (1976). Plaintiffs cannot meet that burden.

The ordinance exempts "[h]ousing units [that] are situated on the grounds of hospitals, regularly patrolled by a security force, and wherein such grounds are revisited by a security patrol at least once an hour." The ordinance also does not apply to "any dwelling unit [that] is a condominium development or any rental or condominium building with units each having an individual exterior entrance."

Councilman Grant suggested a rational basis for the decision to exclude housing units on hospital grounds, noting that "[u]nits that are excluded would be those * * * such as *hospitals and what not, where they already have armed security.*" Later in the hearing, Councilman Grant reiterated his reason for the distinction, saying, "The ordinance is one for safety and protection[,] and at this time, I'm not prepared to exempt any one [sic] further, other than what the ordinance indicates. *For instance, the University of Medicine and Dentistry, they have a built-in Police Department."* That clearly demonstrates a rational basis for the distinction: hospitals already have their own police and armed security.

Likewise, a rational basis exists for the distinction between buildings with a common entrance and condominium complexes in which each unit has its own exterior entrance. The trial court and Appellate Division did not consider that objection because the Council added that exemption by amendment after those courts had considered this case. The City answers plaintiffs' challenge by contending that an armed security guard "might be very effective if he could guard an entrance used by all the tenants, but his effectiveness would decrease if he could guard only one of many exterior entrances to apartment units." The City's decision that an armed guard with responsibility for one common entrance would be more effective than the same guard if the guard were responsible for more than 100 individual entrances is not clearly irrational.

## VI

Judgment affirmed.

O'HERN, J., dissenting.

This case illustrates further the reality that the true victims of inner-city crime are the residents themselves. When the citizens in this community cried out for police protection, the answer they received was "buy your own police." Not so long

ago, in the context of a case concerning private-landlord tort liability, a Michigan justice foresaw what we now experience.

Public safety is the business of government.

Today's decision concedes the failure of government to make the streets and homes of certain areas reasonably safe and in effect transfers the governmental function of public protection to the unfortunate owners of real property in such places.

\*       \*       \*       \*       \*       \*       \*       \*

The intrusion of private industry into the business of public safety has been one of the most unfortunate phenomena of the 1960's and the 1970's. Already, there are subdivisions which operate their own patrol cars; private police and private guards are multiplying * * *.

[*Johnston v. Harris,* 387 *Mich.* 569, 198 *N.W.*2d 409, 411–12 (1972) (Brennan, J., dissenting).]

Unlike those who can take sanctuary in privileged areas, the citizens of Newark must contend with the crushing burden of crime. Everyone shares the concerns of the City's residents. Its council members are no less concerned than those anywhere else.

But the problems that they face are seemingly beyond the financial capacity of the City. Our Court errs, however, when it denies the reality of the situation. It treats the ordinance as if it were a property-maintenance code within the general-welfare jurisdiction of the governing body.

Just as we would never tolerate an abdication by a governmental agency of its function to govern, *see First Peoples Bank v. Township of Medford,* 126 *N.J.* 413, 420–21, 599 *A.*2d 1248 (1991) (observing that permit-repurchase provision in ordinance insures that control of local development remains with municipality and not with private landowners), we cannot, consistent with law, sustain an abdication of the police function by a municipal governing body. The comments of the council members who voted in favor of the ordinance demonstrate its functional significance. One councilman said:

Now the City of Newark, likewise, has a responsibility with its Police Department, but given the limited number of policemen we have in spite of adding on each year, there is still a lack of adequate protection *City-wide.* So, this

particular ordinance that I've introduced is simply one to help protect the lives of the persons that we serve.

[Emphasis added.]

Another councilman stated that "the residents want more police officers and they know they have to bear the cost of that because that is a service the taxpayers pay for." Another added that in his view the presence of an armed-security guard in open spaces in an apartment complex or a high-rise with a large court would deter criminal activity. Nothing could be clearer than that the ordinance represents a well-intended desire to increase the number of police officers in the community.

Like every other function of government the cost of police service should be included within the cost of general municipal services. As enacted, the provision imposes the financial burden on the victims of crime themselves, for, as Chief Justice Weintraub once explained:

> The bill will be paid, not by the owner, but by the tenants. And if, as we apprehend, the incidence of crime is greatest in the areas in which the poor must live, they, and they alone, will be singled out to pay for their own police protection. The burden should be upon the whole community and not upon the segment of the citizenry which is least able to bear it.
>
> [*Goldberg v. Hous. Auth. of Newark*, 38 *N.J.* 578, 591, 186 *A.2d* 291 (1962).]

Paradoxically, the trial court, in sustaining the ordinance, took note of the fact that the background problem far exceeded the conditions at any of the sites affected by the ordinance. The court detailed the deficiencies in the State's and county's prosecutorial and law-enforcement functions and recited the need for more judges and public defenders, emphasizing that protecting people from crime "is a paramount function of *government.*" (Emphasis added.)

In addition, a municipal ordinance may not preempt State gun-control policy. The premise of the ordinance that the Court sustains is that private citizens must arm themselves to insure their own safety. Is this not what the National Rifle Association has been saying? Does the holding not suggest, then, a contradiction with the State's current gun-control poli-

cies? The Michigan Supreme Court summarized the appropriate allocation of responsibility:

> The inability of government and law enforcement officials to prevent criminal attacks does not justify transferring the responsibility to a business owner * * *. To shift the duty of police protection from the government to the private sector would amount to advocating that members of the public resort to self-help. Such a proposition contravenes public policy.
>
> [*Williams v. Cunningham Drug Stores, Inc.*, 429 *Mich.* 495, 418 *N.W.*2d 381, 385 (1988).]

In New Jersey, we differ from other jurisdictions over whether private security officers, by their status alone, have the right to carry handguns. The Attorney General has recognized that the status as an employee of a licensed private-detective agency or security service is insufficient to establish justifiable need. The Attorney General has concluded that

> the standard of "justifiable need" [to obtain a license for a handgun] requires an applicant-employee of a security agency to demonstrate that he performs statutorily-authorized duties under circumstances that present a substantial threat of serious bodily harm, and that carrying a handgun is necessary to reduce the threat of unjustifiable serious bodily harm to any person.
>
> [*In re Preis*, 118 *N.J.* 564, 572, 573 *A.*2d 148 (1990).]

The trial court was of the view that in the event private security guards were not available, the apartment owners could hire off-duty municipal police officers or special police officers. However, the law is equally clear that special police officers may not carry weapons when off duty unless they have a permit. *N.J.S.A.* 2C:39–6.a.(7)(b); *Belmar Policemen's Benevolent Ass'n Local 50 v. Borough of Belmar*, 89 *N.J.* 255, 263, 445 *A.*2d 1133 (1982); *In re Rawls*, 197 *N.J.Super.* 78, 87, 484 *A.*2d 53 (Law Div.1984).

Finally, the Attorney General has stated that regular members of a municipal police department, during their off-duty hours, may engage in police-related activities for private commercial establishments as employees without being in violation of the Private Detective Act so long as those activities do not constitute the business of a private detective, security guard, or watchman. *Preis, supra*, 118 *N.J.* at 576, 573 *A.*2d 148 (refer-

ring to Atty. Gen. F.O.1978, No. 11, *cited in Rawls, supra,* 197 *N.J.Super.* at 88, 484 *A.*2d 53).

The three cases on which the majority relies, *Hudson Circle Servicenter, Inc. v. Kearny,* 70 *N.J.* 289, 359 *A.*2d 862 (1976); *Sunrise Village Associates v. Borough of Roselle Park,* 181 *N.J.Super.* 567, 438 *A.*2d 945 (Law Div.1980), *aff'd,* 181 *N.J.Super.* 565, 438 *A.*2d 944 (App.Div.1981), *certif. denied,* 89 *N.J.* 413, 446 *A.*2d 144 (1982); and *Bonito v. Bloomfield Township,* 197 *N.J.Super.* 390, 484 *A.*2d 1319 (Law Div.1984), do support the proposition that government has the power to require the assistance of private citizens in the performance of its protective services. Those cases, though, in no way require us to uphold the City's ordinance. *Sunrise Village Associates,* the only case involving the protection of large multiple dwellings, thus provides the closest analogy to this case. In finding that the ordinance did not transfer the governmental duty to provide police protection to a private party, the court relied on the fact that the required uniformed security guards were not "empowered to * * * carry weapons." 181 *N.J.Super.* at 573, 438 *A.*2d 945. In *Hudson Circle Servicenter,* this Court also emphasized that the business services required of the truck-stop operator did not extend to the traditional police function of carrying weapons. 70 *N.J.* at 306–07, 311, 359 *A.*2d 862 ("Kearny's ordinance does not shift the entire burden of providing police protection upon the truck stop owner"; no evidence that Kearny sought to compel formation of private police force). How then do we explain the leap made in the Newark ordinance to require armed security when, presumably, the absence of the requirement that the guards be armed sustained the ordinances in *Sunrise Village Associates* and *Hudson Circle Servicenter*? The answer is that we cannot.

I do not take issue with the municipal power to require some assistance from private entities in providing security, as the municipalities did in *Hudson Circle Servicenter, Bonito,* and *Sunrise Village Associates.* My concern is that the Newark ordinance goes too far, thereby permitting the City to shift its

responsibility onto the shoulders of private entities. Furthermore, the ordinance is unfair to plaintiffs, or their tenants, to the extent it imposes an added financial burden on them. The ordinance calls for armed police protection, an essential function of government. As such, the financial burden of providing the service should be borne by the community as a whole.

I would reverse the judgment of the Appellate Division and hold that the City of Newark's ordinance unfairly imposes on plaintiffs the traditionally governmental function of providing police protection to the extent that it requires the property owners to provide armed security guards. With the imposition of the armed-security requirement, the City has crossed "the line dividing security services from police services." *Ante* at 192, 623 *A.*2d at 1372.

Justice GARIBALDI joins in this opinion.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK and STEIN—5.

*For reversal* —Justices O'HERN and GARIBALDI—2.