830 A.2d 507 (2003)
363 N.J. Super. 10
In the Matter of the APPLICATION OF Charles P. BORINSKY.
In re Rodger D. Jones, Craig S. Johnson, Anthony T. Teti.
In The Matter of the Application of Joseph W. Haffner, Jr.
Superior Court of New Jersey, Appellate Division.
Submitted December 4, 2002.
Decided August 28, 2003.
*508 Evan F. Nappen, attorney for appellants Borinsky in A-2891-01 and Haffner in A-5911-01.
Arthur J. Marchand, Cumberland County Prosecutor, attorney for appellant State of New Jersey in A-4304-01, A-4305-01, and A-4307-01 (Keith A. Bursack, Assistant Prosecutor, on the brief).
Michael M. Rubbinaccio, Morris County Prosecutor, attorney for respondent State of New Jersey in A-2891-01 and A-5911-01 (Joseph Connor, Jr., Assistant Prosecutor, on the briefs).
Ritter Law Office, attorneys for respondents Jones, Johnson, and Teti in A-4304-01, A-4305-01, and A-4307-01 (Theodore H. Ritter, of counsel; Susan E. Iacovone, on the joint brief).
Peter C. Harvey, Acting Attorney General, attorney for amicus curiae State of New Jersey in A-4301-01, A-4305-01, A-4307-01, and A-2891-01 (Lori Linskey, Deputy Attorney General, of counsel and on the briefs).
Richard P. Blender, attorney for amicus curiae International Fidelity Insurance Company, in A-2891-01T5.
Before Judges KESTIN, EICHEN and FALL.
The opinion of the court was delivered by KESTIN, P.J.A.D.
These five appeals raise common issues. A-4304-01, A-4305-01, and A-4307-01 were consolidated by our order shortly after they were filed. We now consolidate them with A-2891-01 and A-5911-01 for the purposes of this opinion.
Charles P. Borinsky, Rodger D. Jones, Craig S. Johnson, Anthony T. Teti, and Joseph W. Haffner, Jr. (collectively, applicants) are all "bail enforcement" or "fugitive recovery" agents employed by various entities to investigate, locate, and apprehend criminal defendants who have "jumped bail," i.e., in the terms of the pertinent statute, N.J.S.A. 2C:29-7, "person[s] set at liberty ... with ... bail" who have "fail[ed] to appear" "at a specified time and place in connection with any offense or any violation of law punishable by a period of incarceration[.]" Pursuant to N.J.S.A. 2C:58-4c and N.J.A.C. 13:54-2.1 to -2.10, each applicant sought a permit to carry a handgun from the Chief of Police of the municipality in which he resided. The Borinsky, Jones, Johnson and Teti *509 applications were denied on the local level; the Haffner application was approved.
Each denied applicant appealed from the local action to the Law Division. See N.J.S.A. 2C:58-4e and N.J.A.C. 13:54-2.8. The Haffner matter came before the court by reason of the court's statutory and regulatory oversight responsibilities, pursuant to N.J.S.A. 2C:58-4d and N.J.A.C. 13:54-2.5, whenever an application is approved.
The Borinsky and Haffner matters were heard in Morris County; the Jones, Johnson, and Teti appeals were heard in Cumberland County. The court in Morris County upheld the Borinsky denial for reasons articulated on the record and in a superseding written opinion; and it disapproved the Haffner application for reasons expressed on the record. The court in Cumberland County granted the permits sought for reasons stated on the record.
The applicants appeal from the Morris County dispositions. The State appeals from the Cumberland County dispositions. The Attorney General, having appeared as amicus curiae in the Borinsky matter on the trial court level, sought and received leave to appear as amicus curiae on appeal in the Jones, Johnson and Teti matters, as well. We affirm the Morris County determinations, on a basis different from that employed by the trial judge therein; and we reverse the orders entered in Cumberland County.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. The Jones, Johnson and Teti MattersCumberland County
Jones, Johnson and Teti, the respondents in the Cumberland County appeal, have filed a joint brief. They are all employed as fugitive recovery agents by Ameritac Security and Investigation, Inc. of Millville (Ameritac). Their applications for permits to carry handguns were denied by the Millville Chief of Police on the basis that each, as a private citizen, had failed to establish justifiable need to carry a handgun. These applicants contend that in each letter memorializing his denial, the Chief of Police inaccurately stated that the applicant was "employed by private security." See N.J.A.C. 13:54-2.4(d)(2).
The hearing before the trial court on April 9, 2002 was conducted on the basis of a stipulation that each applicant had demonstrated "thorough familiar[ity] with the safe handling and use of handguns," and that each was "a person of good character, not subject to any disabilities which would prevent [him] from obtaining a permit[.]" Each applicant testified that he had been employed by Ameritac since its inception in October 2001, commencing his fugitive recovery activities in December, after completing a training course. Jones and Johnson had previously been in the trucking industry and Teti had operated a body shop.
Ameritac's first fugitive apprehension occurred on January 1, 2002. In the three months between that date and the trial court hearing, the applicants had been shot at and threatened with a variety of weapons in the course of their work. Because they were unarmed, they carefully screened cases and declined to participate in those in which the fugitives were known to be armed and dangerous.
As a standard practice, the local police department is advised before Ameritac personnel proceed in their attempts to apprehend any fugitive. Sometimes, the police insist on escorting the agents. All the applicants testified that their responsibilities as "team leaders" or "door guides" include the task of securing and controlling *510 the area in which their unarmed team members are functioning. Johnson testified:
That's why it's imperative that the three of us be allowed to carry[,] because we're responsible for the rest of these people out in the field. We're the ones making the calls and the decisions on what's going to be going down.

B. The Borinsky Matter Morris County
Borinsky is employed by S & S Fugitive Recovery, Inc. (S & S) of Newark. He is a former investigator for the Essex County Sheriff, was assigned for a time as a sheriff's officer to a trial judge, and had been a firearms marksmanship instructor in the United States Marine Corps. In discharging his responsibilities as a fugitive recovery agent in and around Newark, Borinsky provides assistance and intelligence to the Newark Police Department.
His experiences in the course of his work, as well as the demands of the job, are similar to those recounted by the other applicants. Borinsky's asserted need for a permit is based upon the same personal safety concerns posited by the other applicants.
The Chester Township Chief of Police denied Borinsky's application because he was unable to communicate with S & S to verify Borinsky's employment. On September 21, 2001, the Chief of Police denied the permit "based upon you failing to justify your need to carry a handgun for employment purposes." On October 3, 2001, Borinsky appealed to the Law Division in Morris County for trial court review.
At the initial hearing, the trial court continued the matter so that the Attorney General could be invited to intervene. After the plenary hearing that ensued, the court found that Borinsky's employment with S & S had been verified. In the hearing, Borinsky testified that out of concern for his safety, because he is unarmed, and a handgun is necessary for self-defense, he has not participated in a raid for some time, limiting his activities to conducting investigations, gathering intelligence, setting up surveillance, and providing other support.
The trial court specifically found there were no general factual grounds for denying the permit such as might exist as a matter of background or character evaluation. The court also found that Borinsky is familiar with the mechanics of firearms, can handle them safely, and has a good understanding of the circumstances in which it might be appropriate to use a firearm in defense. Nevertheless, the court upheld the denial of the permit on general legal and public policy grounds.

C. The Haffner MatterMorris County
Haffner is currently employed as a bail enforcement agent by Mirage Enterprises of Rockaway. At the time of his application and the trial court hearing he was employed by Affordable Bail Bonds. He had been engaged in this kind of work for four years. Haffner testified that his duties included those of a bail bondsman as well as a fugitive recovery agent. His description of his job functions as a fugitive recovery agent and his experiences in discharging those duties was similar to those recounted by the other applicants. He testified also that, by reason of his additional bail bondsman responsibilities, he frequently carries large amounts of cash. The Law Division judge recognized this latter factor as another basis of need for the permit.
Haffner has a college degree in business administration and formerly worked in the telecommunications industry. He has successfully completed classes in firearm handling and proficiency.
*511 With respect to local police involvement in his fugitive apprehension activities, Haffner testified that although he always provides notice to local police, most often they are not interested in participating.
As we have noted, the procedural posture of the Haffner matter is different from the others. The Rockaway Township Chief of Police determined that a permit to carry a handgun should be issued to Haffner. The matter came before the Law Division by reason of the court's statutory and regulatory oversight responsibilities, pursuant to N.J.S.A. 2C:58-4d and N.J.A.C. 13:54-2.5, upon approval of an application.
The trial court found Haffner to be "intelligent and responsible," with no background or character-evaluation blemish or disability. The court also found that Haffner satisfied the statutory standard for familiarity with handgun use. The application was disapproved, however, essentially for the legal and public policy reasons the same judge had employed in the extensive written opinion explaining the denial of the Borinsky permit.

II

THE TRIAL COURT RATIONALES
The decision in the Borinsky matter was rendered first. The Morris County Law Division judge's findings of fact and disposition affirming the permit denial were explained on the record on January 30, 2002, and later formalized in an extensive, superseding written opinion filed on February 5, 2002.
The Cumberland County Law Division judge's determination reversing the three permit denials before him was made on April 9, 2002. His findings of fact and rationale were articulated in an oral opinion.
The Haffner matter was the last to be decided, on July 2, 2002, by the same judge who had ruled in the Borinsky matter. The judge's findings of fact and explanation of his decision to disapprove the permit were set out in an oral opinion.

A. The Morris County Rationales (Borinsky/Haffner)
The Morris County judge addressed the three statutory criteria for granting a permit to carry a handgun: "that the applicant is a person of good character who is not subject to any of the disabilities set forth in [N.J.S.A.] 2C:58-3c, that he is thoroughly familiar with the safe handling and use of handguns, and that he has a justifiable need to carry a handgun." N.J.S.A. 2C:58-4d. Expressly finding no grounds for disqualification on the basis of either of the first two standards, the judge then turned to the third criterion: "justifiable need to carry a handgun."
The judge noted that "bail bondsmen themselves frequently seek to secure the apprehension of [a non-appearing] defendant [on bail in order to] avoid forfeiture of the bail." They have arrangements with fugitive recovery agents "to locate and apprehend the defendant and bring him back before the court." In his oral opinion, the judge had noted his
concern[] with the public safety risks that are involved when we have private citizens going out, arresting criminal defendants, when there's a high risk that the criminal defendant is armed and may resist; and if he does and the apprehender becomes involved in that kind of a confrontation, there's an obvious risk that the defendant can be injured or killed, the arresting or apprehending bail enforcement person can be injured or kill[ed], and innocent bystanders can be injured or killed. There's nothing that says when they go in to arrest somebody, he's in an apartment or house *512 all by himself. There are sometimes other people there, and sometimes the other people are rather vulnerable, younger people. We didn't actually get to specific testimony about it in this case, but there are sometimes, I know in other cases, children in these apartments, and we have reported cases where children have been involved, when bail bondsmen go in to make arrests, kids just happen to be there when they go to get the defendant.
So there's a risk that those kinds of people can be injured; and then, of course, there's just a risk that bystanders, people walking down the street ... that, could be injured .... and even killed.
So there are serious public safety issues with respect to whether it's a good idea to allow bail bondsmen and companies like Mr. Borinsky's, which work for bail bondsmen ... to go on their own, as private citizens, without police assistance, and apprehend potentially dangerous criminals.
The judge found from the record before him that although the police are usually informed of a recovery agent's plan, police assistance is not requested as a rule and the police "would not readily lend ... assistance in making an apprehension." The witnesses before the judge had expressed the "thought that local police departments were typically satisfied to have apprehensions made by organizations such as S & S Fugitive Recovery." The judge viewed the issue before him as "whether bail bondsmen [and their agents] should be doing this work."
In both his oral and written opinions, the judge engaged in an exhaustive and scholarly analysis of the holdings and effects of Taylor v. Taintor, 83 U.S. (16 Wall.) 366, 21 L.Ed. 287 (1873), and Reese v. United States, 76 U.S. (9 Wall.) 13, 19 L.Ed. 541 (1870), and their federal caselaw progeny, see, e.g., Lund v. Seneca County Sheriff's Dept., 230 F.3d 196 (6th Cir.2000); Kear v. Hilton, 699 F.2d 181 (4th Cir. 1983), on the basis of which the applicants had posited the proposition, also advanced on appeal, that:
Professional bondsmen in the United States enjoy extraordinary powers to capture and use force to compel peremptory return of a bail jumper. They may do so not only in the state where bail was granted, but in other states as well, without resort to public authorities, either the police to effect the arrest or the appropriate state officials to bring about extradition.
To the extent Taylor and Reese could be read to stand for the principle advocated by the applicants, the judge held, inter alia, that those cases "do not set out binding interpretations of federal constitutional law. Instead, they are simply cases setting forth an interpretation of common law principles dealing with contract law and surety law[,]" views not binding on state courts since Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
The judge went on, in his analysis of New Jersey law, to explore the public policies relating both to firearm licensure and the activities of fugitive recovery agents. He opined that "the physical apprehension of bail jumpers should be placed in the hands of professionally trained law enforcement officers who are functioning in well disciplined public agencies which are subject to tight legal control and which are accountable to the public," rather than committed to the vagaries of the ways in which private agencies choose to conduct their businesses. In so reasoning, the judge gave considerable weight to the views of the Attorney General as the State's chief law enforcement officer "that *513 the apprehension of bail jumpers [by persons in the private sector] poses an unacceptable risk to public safety." After specifically considering and rejecting several particular arguments offered by the applicant, the judge cited In re Applications of Preis, 118 N.J. 564, 573 A.2d 148 (1990), and New Jersey State Special Police Association, Inc. v. Attorney General, 201 N.J.Super. 75, 492 A.2d 1018 (App.Div. 1985), as examples of cases applying the Legislature's policy of strict gun control, and concluded "that the general policy underlying our gun control laws in New Jersey calls for great caution with respect to allowing fugitive recovery agents ... to have a permit to carry a handgun."
In denying the Haffner application several months later, the judge relied on the same policy considerations enunciated in his disposition of the Borinsky application, concluding, as well, that Haffner's activities as a bail bondsman and his sometime practice of carrying large amounts of cash did not provide sufficient additional reason to grant the permit.

B. The Cumberland County Rationale (Jones/Johnson/Teti)
The Cumberland County judge applied a different sense of the public policies involved. He agreed with the view expressed by the Morris County judge that apprehension of bail-jumpers should be seen as a duty of law enforcement officers, but he opined that local law enforcement lacked the resources to do the job. He regarded fugitive recovery agents as performing an essential function "in the pursuit of the interest of justice[,]" and determined that they were entitled to the self-protection that a permit to carry a handgun would bestow.
The judge held, based on
the nature of what they have done and will be required to do[,] ... these individuals ... have met the justifiable need and in the course of performing their duties these applicants will be subject to a substantial threat of bodily harm[,] and a handgun by each of these applicants is necessary to reduce the threat of unjustifiable serious bodily harm to any person.
* * *
I do not find any case that says on a case law basis that if this court finds justifiable need in the performance of their responsibilities, responsibilities that are dictated by the nature of the business itself, by the nature of the fact that we impose upon their bondsmen the forfeiture statute. And the nature of the fact that the law enforcement is just not duly funded nor equipped to have a department that can specialize in this at the present time.
Should that occur, then obviously there would be no need to have these individuals carry handguns for the performance of their duties because all they'll have to do is show up at the police department and be accompanied by the police officer or a police officer would do it or they would do it on a regular routine basis as part of the warrant section of their particular duties.
Accordingly, the court having made those findings the court grants the permit with the understanding that the weapons can only be carried when on duty in the performance of a apprehension of a fugitive and at that time and that time only.
Furthermore, the handgun is to be a handgun approved by the Superintendent of the State Police. * * *
Furthermore, obviously they will be required to fulfill all the other requirements necessary as part of the permit....

*514 III

THE ARGUMENTS PRESENTED ON APPEAL

A. Borinsky and Haffner
The arguments advanced on appeal by Borinsky and Haffner are essentially identical, and are expressed in two main points. The general tenor of the first point is:

POINT I: THE COURT BELOW ERRED IN RULING THAT BAIL ENFORCEMENT AGENTS MAY NOT APPREHEND FUGITIVES.
The contentions begin with arguments premised on federal caselaw beginning with Taylor and Reese. They continue with a number of subpoints stated somewhat differently in the two briefs, but essentially advancing identical arguments:
a. [The trial court judge's] decision opens a floodgate of pretrial and post-trial criminal Due Process issues which criminal defendants can now raise regarding their "false arrest" and subsequent searches, seizures and interrogations founded thereon.
b. If [the] decision is upheld, then the floodgates of civil litigation are now opened so that any fugitive who was apprehended by a bail enforcement agent can bring a civil action for "false arrest" and utilize [the judge's] decisions, as well as the Attorney General's opinion in this case, to argue that the authority did not exist for the bail enforcement agent to make the "arrest."
c. [The] decision puts out a welcome mat to fugitives across the country to come to New Jersey because bail enforcement agents cannot make apprehensions in New Jersey, and only the police departments who are sometimes "not particularly responsive to requests to apprehend fugitives" can attempt to seize the fugitives.
d. [The judge's] approach would dramatically increase ... both the cost and risk involved with the issuance of bail bonds by surety companies as they will no longer be allowed to recover their fugitives in an expeditious manner.
e. The increased cost and risk of bail bonds would increase the already overcrowded jail population.
f. [The judge's] approach would further burden the already over-tasked law enforcement resources, which are paid for by taxpayers, instead of allowing the continuance of an existing system which is largely funded by insurance companies [and is] an efficient and successful system.
g. [The judge's] proposal would set an unenforceable standard for bail agents.
h. No evidence has ever been presented that bail recovery agents pose a threat to any person.
The second main points in the Borinsky and Haffner briefs are also essentially identical:

POINT II: THE COURT BELOW ERRED NOT GRANTING APPELLANT'S PERMIT TO CARRY A HANDGUN.

B. Jones, Johnson and Teti
In responding to the State's appeal from the trial court order granting their permit applications, Jones, Johnson and Teti, in their joint brief, advance the following arguments:

POINT I: THIS COURT MAY ONLY REVERSE IF THE RECORD DEMONSTRATES THAT [THE TRIAL COURT JUDGE'S] FINDINGS OF FACT AND CONCLUSIONS OF LAW WERE ARBITRARY, CAPRICIOUS AND UNREASONABLE.

*515 POINT II: THE TRIAL COURT PROPERLY APPLIED THE LAW TO THE FACTS AND FOUND THAT JOHNSON, JONES AND TETI ALL SATISFIED THE REQUIREMENT OF "JUSTIFIABLE NEED" TO CARRY A HANDGUN.
A. THE RECORD BELOW CONTAINS SUFFICIENT CREDIBLE EVIDENCE TO SUPPORT [THE JUDGE'S] FINDINGS THAT JOHNSON, JONES AND TETI DEMONSTRATED "JUSTIFIABLE NEED" TO CARRY A HANDGUN.
B. FUGITIVE RECOVERY AGENTS SHOULD BE JUDGED BY THE SAME STANDARD OF "JUSTIFIABLE NEED" USED IN CONJUNCTION WITH PRIVATE DETECTIVES AND SECURITY GUARDS.

POINT III: AS EMPLOYEES OF A LICENSED PRIVATE DETECTIVE AGENCY THE STANDARD OF "JUSTIFIABLE NEED" SET FORTH IN N.J.A.C. 13:54-2.4(2) IS NOW APPLICABLE TO RESPONDENTS.

POINT IV: FUGITIVE RECOVERY AGENTS PROVIDE A NECESSARY PUBLIC SERVICE.

POINT V: THE JOB RESPONSIBILITIES AND DUTIES OF TRAINED FUGITIVE RECOVERY AGENTS ARE COMPARABLE TO THOSE WHO WORK IN LAW ENFORCEMENT AND PERSONAL SECURITY.

POINT VI: THE STANDARD UNDER WHICH GUN PERMITS HAVE BEEN ISSUED TO FUGITIVE RECOVERY AGENTS IN NEW JERSEY IS NOT UNIFORM.

POINT VII: PERMITS TO CARRY HANDGUNS ARE SUBJECT TO REASONABLE SAFEGUARDS THAT SERVE TO ASSURE THE PROTECTION OF THE PUBLIC.

C. The State As a Party
Similar arguments are advanced by the respective county prosecutors, as respondent in the Borinsky/Haffner appeal and as appellant in the Jones/Johnson/Teti matter.
The Morris County Prosecutor argues in each of his cases that the trial court judge "properly refused to grant a pistol carry permit" and that "bounty hunters enjoy no federal right to apprehend fugitives."
The Cumberland County Prosecutor frames the State's arguments as follows:

POINT I: APPELLANTS DO NOT MEET THE LEGISLATIVE STANDARD AND ARE NOT ENTITLED TO PERMITS TO CARRY HANDGUNS.

POINT II: APPELLANTS HAVE NOT DEMONSTRATED JUSTIFIABLE NEED TO CARRY A HANDGUN.

POINT III: THERE IS NO ISSUE OF FAIRNESS WITH REGARD[] TO FUGITIVE RECOVERY AGENTS WHO HAVE PERMITS TO CARRY HANDGUNS THAT COMPETE WITH THOSE WHO HAVE BEEN DENIED PERMITS TO CARRY HANDGUNS.

D. The Attorney General As Amicus Curiae.
The Attorney General makes essentially identical arguments in those appeals in which he appears as amicus curiae, the Borinsky appeal and the Jones/Johnson/Teti matter. In the first point of each brief, the Attorney General argues that each applicant failed to demonstrate justifiable need for a permit to carry a handgun, and that the "justifiable need requirement for a permit to carry a handgun cannot be determined exclusively upon the occupation of the applicant." In the Borinsky *516 appeal, the Attorney General also argues that the trial court judge "erred in concluding that the applicant met the good character standards required to obtain a carry permit."
While urging an affirmance of the permit denial in the Borinsky matter, the Attorney General argues that the trial court judge "relied upon an infirm rationale for the carry permit denial[,]" and that we should nevertheless affirm the denial even if we disagree with the basis for the trial court judge's decision. Finally, in each of his briefs, the Attorney General argues that
THE UNFETTERED USE OF FORCE BY BOUNTY HUNTERS POSES A SERIOUS RISK TO PUBLIC SAFETY.
and that
THE CURRENT SYSTEM OF HAVING ONE GUN PERMIT JUDGE IN EACH COUNTY RULE ON THE ISSUANCE OF PERMITS TO CARRY CONCEALED WEAPONS IS YIELDING INCONSISTENT RESULTS.
In the latter point, the Attorney General invites us to furnish "guidance ... further delineating when the justifiable need standard has been met[.]"

IV
We accept as binding, because supported by substantial credible evidence in the record, see Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495, 500-01 (1974); In re Application of Boyadjian, 362 N.J.Super. 463, 475, 828 A.2d 946, 955 (App.Div.2003), the trial court judges' evaluations in all the matters before us that each of the applicants was not disqualified from the permits sought by any of the personal factors enumerated in N.J.S.A. 2C:58-3c or because of a failure to demonstrate adequate "familiar[ity] with the safe handling and use of handguns." See N.J.S.A. 2C:58-4c.
We are not bound, however, by the rule-of-law bases undergirding the trial judges' evaluations whether the applicants had met the third standard of N.J.S.A. 2C:58-4c, "justifiable need to carry a handgun." See Manalapan Realty v. Manalapan Tp. Comm., 140 N.J. 366, 378, 658 A.2d 1230, 1237 (1995)(stating that, on appellate review, no special deference is given to "[a] trial court's interpretation of the law and the legal consequences that flow from established facts"). We cannot accept the Morris County judge's view that, as a matter of public policy, fugitive recovery agents, as a class, ought not to be granted permits to carry handguns. No such broad disqualification appears in the legislation governing the subject. See Preis, supra, 118 N.J. 564, 573 A.2d 148 (holding that "justifiable need" must be evaluated on a case-by-case basis on a determination "(1) that the applicant, in the course of performing statutorily-authorized duties, is subject to a substantial threat of serious bodily harm; and (2) that carrying a handgun is necessary to reduce the threat of unjustifiable serious bodily harm to any person"). We likewise reject the expressed view of the Cumberland County judge that fugitive recovery agents, as a class, qualify for handgun permits because of the dangers inherent in their work. The holding of Preis precludes that classificational approach, as well. The categorical exemptions from State law prohibitions against carrying handguns without a permit are set out with great precision in N.J.S.A. 2C:39-6. Beyond those, there are no exceptions, in particular none that include bail bondsmen, sureties, or fugitive recovery agents.
Short of adopting a classificational approach, we view the arguments advanced by the Attorney General to be persuasive. *517 None of the applicants before us has satisfied the justifiable need criterion. For present purposes, there is no difference between the instant applicants' statuses as fugitive recovery agents and the private security officer applicants in Preis. "Generalized fears for personal safety are inadequate [as a basis for a permit], and a need to protect property alone does not suffice." Preis, supra, 118 N.J. at 571, 573 A.2d at 152; see also Siccardi v. State, 59 N.J. 545, 557, 284 A.2d 533, 540 (1971)(stressing the difference between "real danger" to life "as evidenced by serious threats or earlier attacks," and "concern ... with the safety of ... property").
The status of fugitive recovery agent is not recognized for any purpose by State statute, and it is of no consequence whether federal law confers any rights upon the applicants to function along those lines. The State retains the power to establish its own standards for weapon possession licensure, irrespective of whatever occupational rights may be established elsewhere. In conducting their activities to vindicate the monetary interests of the bail bondsmen who retain them, the applicants are free to seek police assistance. They have no legal responsibility to act without it, and thus have no special standing to claim the right to permits to carry handguns in order to do so. Given this State's commitment to minimizing the violence that freer access to firearms promotes, see State v. Pleva, 203 N.J.Super. 178, 189, 496 A.2d 375, 381 (App.Div.), certif. denied, 102 N.J. 323, 508 A.2d 203 (1985), it is not inappropriate, as a general matter, that the applicants should be discouraged from their private pursuit of armed and dangerous fugitives and relegated to the need to seek police assistance in such instances. Moreover, the records before us establish with clarity that many of the fugitives the applicants seek are not armed and dangerous.
We agree with the Morris County judge's assessments of the personal and public dangers that would be presented by recognizing fugitive recovery agents, categorically, to be a special class for handgun permitting purposes. The Legislature has not undertaken to create such a class and no judge is warranted to do so. We have agreed, as well, with the Morris County judge's views that Taylor and Reese have no limiting impact on a state's authority to establish its own gun control standards. Accordingly, we reject any arguments advanced by the applicants based upon the premise that such rights as they may enjoy under Taylor and Reese and the cases decided thereunder require the grant of a permit to carry a handgun in the discharge of their fugitive recovery activities.
In sum, we differ with the views of both trial judges that the handgun-carry permit issue regarding fugitive recovery agents can be dealt with categorically to require either a "grant" or "deny" result or presumption in every instance. We hold that each application must be dealt with on its own merits, on a case-by-case basis. We find that none of the applicants herein has made a sufficiently particularized showing of justifiable need to carry a handgun in the pursuit of his voluntarily undertaken, private activities. As a general matter, those activities, when conducted by armed agents, pose a threat to public safety by their very nature. The risk is heightened when such persons, displacing the police, are given opportunity to engage in gunfire exchanges with armed and dangerous fugitives. Although these latter factors may not be considered dispositive, they cannot be ignored, either, as circumstantial elements to be taken into account in weighing an individual applicant's showing of justifiable need. We discern from the records before us and the nature of the activities at issue that no special circumstances *518 exist in any of the cases warranting a grant of the permit sought.
We also reject all the sub-arguments advanced by Borinsky and Haffner regarding the effects of the Morris County judge's rulings. Those arguments either lack a basis in the record before us, or bespeak extra-judicial policy considerations, or are clearly without merit as a matter of facial evaluation. We agree with the Morris County judge, as well, that, to the extent the positions predicted in some of those arguments come to be advanced in the future, the courts at those times will doubtless deal capably with such contentions on the basis of the records developed.
On another specific issue, we reject the Attorney General's argument that the trial judge erred in the Borinsky matter when he found no basis for disqualification on personal factors. On the record before us, we see no misapplication of the trial court's discretionary authority to evaluate the showings made in that connection. Similarly, we disregard the Jones/Johnson/Teti contention that the Millville Chief of Police erred in describing those applicants as "employed by private security," especially in the face of their arguments that the eligibility of fugitive recovery agents for permits to carry handguns should be judged by the same standard of justifiable need applied to private detectives and security guards. See N.J.A.C. 13:54-2.4(d)2.
Finally, we will not address the Attorney General's argument regarding the inconsistency of results in the current system of having a single gun-permit judge in each county rule on all applications. The case-by-case evaluation regime mandated by Preis will necessarily result in decisions which may be viewed as "inconsistent." Any structural or administrative changes in the system are not within our authority to effect, but rather are within the purview of the Supreme Court in discharge of its rule-making responsibilities, see N.J. Const. Art VI, § 2, ¶ 3, or of the Chief Justice in the exercise of her administrative powers, see N.J. Const. Art. VI, § 6, ¶¶ 1 and 2.
The orders denying the Borinsky and Haffner applications, in A-2891-01 and A-5911-01, are affirmed. The orders granting the Jones, Johnson and Teti applications, in A-4304-01, A-4305-01, and A-4307-01, are reversed.