MICHAEL A. SICCARDI, PLAINTIFF-APPELLANT, v. STATE
OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued October 26, 1971—Decided December 13, 1971.

*Mr. John N. Post* argued the cause for appellant (*Messrs. Post and Staub,* attorneys).

*Mr. Elson P. Kendall,* Assistant Prosecutor, argued the cause for respondent (*Mr. Karl Asch,* Union County Prosecutor, attorney).

*Mr. Fred H. Kumpf,* Deputy Attorney General, argued the cause for Attorney General, intervenor (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Fred H. Kumpf,* Deputy Atty. Gen. and *Miss Phyllis J. Kessler,* Law Student Assistant, on the brief).

The opinion of the Court was delivered by

JACOBS, J. The plaintiff Michael A. Siccardi applied under *N. J. S. A.* 2A:151–44 for a permit to carry a handgun. His application was denied by the Union County Court and he appealed to the Appellate Division which remanded the cause for enlargement of the record. That was done and thereafter we granted the plaintiff's petition for certification.

Siccardi is a resident of Plainfield and manages the Liberty Theater which is located on Front Street in Plainfield. His permit application asserted that (1) he was required to carry substantial sums of money from the theater to a nearby "bank depository in the late evening hours," (2) the theater is located "within the perimeter of the area of recent civil disorder in Plainfield," (3) "there have been numerous incidents involving beatings and robberies in the immediate area of the theater" and (4) he has received "numerous telephone threats" and his "life has been threatened" by persons confronting him "in the theater and on

the street." After investigation, Chief Campbell of the Plainfield Police Department, recommended denial and this was followed, after hearing, by the denial in the County Court. The evidence presented in the County Court pursuant to the Appellate Division's remand indicated the following:

In 1965 Siccardi sought a permit to carry a handgun. Chief Paine of the Plainfield Police Department found that there was an insufficient showing of "need" as required by the statute and Siccardi did not pursue the matter in the County Court. Indeed Siccardi has never held a permit to carry a handgun though he possesses guns both at home, and at the theater; such possession at home and theater is not in issue here (*N. J. S. A.* 2A:151–42(a)) though it may evidentially be the subject of legislative provisions which do not call for carrying permits issuable only on a suitable showing of need. See *N. J. S. A.* 2A:151–32–36; *Burton v. Sills,* 53 *N. J.* 86 (1968), *appeal dismissed,* 394 *U. S.* 812, 89 S. Ct. 1486, 22 *L. Ed. 2d* 748 (1969). Siccardi wants the permit so that he can carry a gun concealed on his person during trips from the theater to the bank depository and on his trips between the theater and his home. See *N. J. S. A.* 2A:151–41–46; *State v. Cusick,* 116. *N. J. Super.* 482, 485–486 (*App. Div.* 1971). He lives in an old residential low crime area about six minutes travel time from the theater. He has lived in the same house since 1927 and it has never been broken into. Though he has been manager of the theater for over twenty years, he has never been assaulted or attacked on his trips between his home and the theater. Though the Siccardi family has operated the theater for over thirty-five years, no member has thus been attacked or assaulted, nor has there ever been any incident involving the theater's proceeds.

Chief Campbell testified that he investigated Siccardi's application and in his opinion "Siccardi failed to justify a need for carrying a weapon." He pointed out that the Plainfield Police Department provides escort service which was al-

ways available to Siccardi in connection with his trips to the bank depository. He did not recall ever getting any complaint from Siccardi about failing to provide the escort service though he did recall that Siccardi had mentioned that he had to wait "and when I explained to him why he seemed to understand it and accept it." Siccardi himself acknowledged that he was fully aware that he could, if he so wished, employ suitable private security guards or a private escort service at a cost of about $3.75 or $4 per hour.

So far as reference in Siccardi's application to the "perimeter of the area" of recent disturbances was concerned, Chief Campbell considered that it had no "bearing on his request to carry a weapon." He pointed out that there are approximately a hundred businesses in the area and no applications for gun permits had been made with respect to those businesses. With reference to Siccardi's statement as to "beatings and robberies," Chief Campbell testified that he would not classify the sites involved in the beatings and robberies as being "in the area of the theater." And finally, he testified that he did not recall any complaints by Siccardi that his life had been threatened. He did recall that Siccardi had told him about some threat by a man who lived near the theater but that man, whom he regarded as a "militant type of person," had threatened "many people in the City of Plainfield." Obviously, Chief Campbell was satisfied that there had been no serious threats against Siccardi calling for further police investigation or action or warranting the issuance of a carrying permit to Siccardi for his self-protection.

Chief Campbell testified that he had been with the Plainfield Police Department since 1949 and had been Acting Chief or Chief since 1967. In 1969 only three applications for carrying permits were approved by him for Plainfield; one to a gun dealer, another to a man employed in a security capacity and a third which is the subject of an appeal now pending before us. He was convinced that possession of a handgun is not well calculated to thwart street robberies;

he knew of no instance during his long tenure where a private citizen not connected with the police department had "thwarted an armed robbery on the streets of Plainfield through the use of a gun." Indeed Siccardi himself testified that if he were granted a permit he would not use his gun to thwart a robbery but only in self-defense; as he put it: "If someone had a gun pointed at me and I had $50,000 in my hand, I would give him the money."

Several police chiefs and a representative of the State Police testified as expert witnesses before the County Court; they all supported a highly restrictive approach in the granting of carrying permits. Thus Chief Roy of the Elizabeth Police Department acknowledged that his standards of "need" were changing "toward the side of more stringency." He had been with the Elizabeth Police Department for almost thirty years and knew of no instance in which a private person who was robbed or assaulted had attempted to thwart the attack through the use of a permitted weapon in his possession. He expressed the view that carrying a permitted weapon is a "practically negligible deterrent in crime." He noted that "what happens is that the criminal selects his particular time when the victim is unaware of the attack. It is a sudden, very swift type of attack where the individual is caught off guard and has no opportunity to get his weapon to use it and this is the reason why the individual, even if he had a weapon, could be just as much a victim of a robbery as an individual who did not have a weapon."

Chief Mass of the Shrewsbury Police Department has been a police officer for eighteen years; he also is president of the New Jersey State Chief's Association. He knew of no instance in his experience where a private person attacked in the street successfully defended himself through the use of a permitted gun. He considered that carrying the gun has no deterrent effect and noted that the crime is usually "over and done with" before the person carrying the permitted weapon can effectively react. He would not

approve an application for a carrying permit unless there was a showing of a "crucial need" such as, *e. g.*, substantiated threats indicating imminent danger to the applicant's life or personal security.

Chief Haney of the Cranford Police Department knew of no instance in Cranford where a permitted gun was used to thwart a holdup or protect the permittee; he considered that the private person's possession of the concealed weapon did not serve at all as a deterrent to crime. He confined his approvals largely to security officers; he had approved only one permit application during the past three years. Chief Moran of the Westfield Police Department approved a single application by a head of a private detective agency; other applications were not pursued when he advised that his department would provide escort service to company employees carrying substantial payrolls. He testified that he concurred with the testimony given by the other Chiefs with respect to the appropriateness of a highly restrictive approach to the granting of carrying permits.

Sergeant Klauss heads the investigation unit of the State Police which processes permit applications for districts having no police chiefs. He detailed the action taken by his department in connection with permit applications and pointed to the many denials where escort services were available and where there had been no substantiated threats to life or personal security. He noted that "stricter measures concerning the issuance of permits are being applied" and that denials are common where there is no showing that they are "absolutely necessary under the circumstances." He expressed the view that the words "necessary" and "need" go hand in hand regarding an application, and "if we feel that the need is not there" or "there are other means for a person to transport monies, or other methods to protect property, so to speak, then, of course, we deny the application." He expressed agreement with the testimony of the police chiefs, noting that the concealed weapon does not operate as a deterrent and that attacks happen with "so

much suddenness that they would have very little chance to use the firearm in the event that they were called upon to do it." He stressed that "historically" private people who attempt to thwart robberies through the use of permitted weapons usually wind up with serious or fatal injuries to themselves.

In their staff report to the National Commission on the Causes and Prevention of Violence, Messrs. Newton and Zimring evaluated the utility of firearms as weapons of defense against crime. They found that private possession of a handgun is rarely an effective means of self-protection; and so far as the carrying of handguns is concerned, they noted that "no data exist which would establish the value of firearms as a defense against attack on the street" though "there is evidence that the ready accessibility of guns contributes significantly to the number of unpremeditated homicides and to the seriousness of many assaults." *Newton and Zimring, Firearms and Violence in American Life, p.* 67 (1968).

The National Commission recommended federal legislation to encourage the establishment of state licensing systems for handguns with authority in each state to determine for itself what constitutes "need" to own a handgun. For those states which fail to enact their own licensing systems, the Commission recommended that "determinations of need be limited to police officers and security guards, small businesses in high crime areas, and others with a special need for self-protection." *Final Report, National Commission on the Causes and Prevention of Violence, p.* 181 (1969). See Mosk, "Gun Control Legislation: Valid and Necessary," 14 *N. Y. L. Forum* 694, 708 (1968), where Justice Mosk, in urging strict regulation, pointed out that in England an applicant for a gun permit must show "good reason" which is narrowly interpreted to exclude "self-defense or property protection, even in the case of persons such as bank guards." See Note, "Firearms: Problems of Control," 80 *Harv. L. Rev.* 1328, 1342 (1967); see also Zimring, "Is Gun Con-

trol Likely to Reduce Violent Killings?," 35 *U. Chi. L. Rev.* 721, 722 (1968); Jacobs, "Firearms Control," 42 *St. John's L. Rev.* 353, 365 (1968); Geisel, et al., "The Effectiveness of State and Local Regulation of Handguns: A Statistical Analysis," 1969 *Duke L. J.* 647, 670; Notes, 38 *U. Chi. L. Rev.* 185, 207 (1970); 114 *U. Pa. L. Rev.* 550, 554 (1966).

The New Jersey Legislature has long been aware of the dangers inherent in the carrying of handguns and the urgent necessity for their regulation. As early as 1882 it prohibited the carrying of guns by youngsters (*L.* 1882, *c.* IV) and almost a half century ago it directed that no persons (other than those specifically exempted such as police officers and the like) shall carry handguns except pursuant to permits issuable only on a showing of "need." *L.* 1924, *c.* 137; *R. S.* 2:176-41-44. Under the terms of the 1924 statute the application for permit was submitted to the local chief of police for approval and, on approval, to the Justice of the Supreme Court holding the circuit for the county in which the applicant was a resident. If, after investigation, the Justice was satisfied with the sufficiency of the application and "the need of such person carrying concealed upon his person, a revolver, pistol or other firearm" he would issue the permit.

The legislative designation of the judiciary as the issuing authority was unfortunate for it burdened the Justices with functions which were clearly nonjudicial in nature; indeed the Justices might well have declined the designation as unduly interfering with the proper discharge of their judicial responsibilities. *Massett Building Co. v. Bennett,* 4 *N. J.* 53, 61 (1950); *In re Application of Schragger,* 58 *N. J.* 274, 279 (1971); *In re: Salaries For Probation Officers of Bergen County,* 58 *N. J.* 422, 426 (1971). In that event the Legislature would presumably have revised the legislative scheme to provide for administrative issuance of permits with limited judicial review comparable to the review now available from administrative determinations generally.

See *R.* 4:69; *R.* 2:2-3; *Monks v. New Jersey State Parole Board,* 58 *N. J.* 238, 248 (1971).

During the period between the passage of the 1924 statute and the recent Gun Control Law (*L.* 1966, *c.* 60; *N. J. S. A.* 2A:151-1 *et seq.; Burton v. Sills, supra,* 53 *N. J.* 86), there were many enactments affecting firearms but none of them changed the requirement that "need" must be shown for the issuance of a permit to authorize the carrying of a handgun. The recent Gun Control Law embodied comprehensive provisions which amended previous regulatory provisions and provided, *inter alia,* for the licensing of manufacturers, wholesalers and retailers, and for the issuance of purchase permits and identification cards to purchasers. *N. J. S. A.* 2A:151-19, 24, 32. The constitutionality of the Law was upheld in *Burton v. Sills, supra,* 53 *N. J.* 86, but the opinion in that case did not cite nor did it have occasion to deal with *N. J. S. A.* 2A:151-44 which is the specific statutory provision applicable to the issuance of permits for the carrying of handguns. That section provides that any person desiring a permit to carry a pistol or revolver shall in the first instance make application to the local chief of police (or to the state superintendent of police if there is no local chief of police) who may approve the application if he is satisfied that there is no statutory disqualification and that there has been a showing of "need." On receiving the approval of the chief of police, the application may then be presented to the County Judge who may issue the permit on being satisfied that the applicant is qualified and has established the "need" for carrying a revolver or pistol. *N. J. S. A.* 2A:151-44. The applicant may have a hearing before the County Judge and review of the County Judge's action may be had in the Appellate Division and, when necessary, in this Court. *Burton v. Sills, supra,* 53 *N. J.* at 91.

█ The appellant correctly asserts that the word "need" has appeared without alteration through all the pertinent legislation since 1924. But he evidently entertains the mis-

taken notion that its contextual concept remains frozen as of that date and that types of permits originally issued must necessarily be issued today. "Need" is a flexible term which must be read and applied in the light of the particular circumstances and the times. See *Gleitman v. Cosgrove,* 49 *N. J.* 22, 53–54 (1967) (dissenting opinion); see also *Sutherland, Statutory Construction* § 5102 (3*d ed.* 1943); *Safeway Trails, Inc. v. Furman,* 41 *N. J.* 467, 477, *appeal dismissed,* 379 *U. S.* 14, 85 S. Ct. 144, 13 *L. Ed. 2d* 84 (1964); *State v. New Jersey Dairies,* 101 *N. J. Super.* 149, 153 (*App. Div.* 1968).

The appellant attacks the adequacy of the word "need" as a statutory guidepost and stresses the traditional doctrine that a legislative delegation must be accompanied by a "sufficient basic standard." *New Jersey Bell Tel. Co. v. Communications Workers, etc.,* 5 *N. J.* 354, 370 (1950). Though the cases still pay lip service to the doctrine they readily sustain standards no more certain and much less definitive than the one at hand. In *Ward v. Scott,* 11 *N. J.* 117 (1952), we noted that standards such as "public convenience and necessity," "just and reasonable," "excessive profits," "fair return," "unfair methods of competition," and others equally general, have been sustained in both state and federal courts. 11 *N. J.* at 122–128. See *Moyant v. Paramus,* 30 *N. J.* 528, 553–554 (1959); *Elizabeth Federal S. & L. Ass'n v. Howell,* 30 *N. J.* 190, 194 (1959); *In re Berardi,* 23 *N. J.* 485, 491 (1957).

In *Burton v. Sills, supra,* 53 *N. J.* 86, we summarily rejected an attack on the sufficiency of the standard in the section of the Gun Control Law (*N. J. S. A.* 2A:151–33) which provides, in part, that no purchase permit or identification card shall be denied except where its issuance "would not be in the interest of the public health, safety or welfare." 53 *N. J.* at 90–91. Surely the standard of "need" is no less a guidepost than the quoted standard in *N. J. S. A.* 2A:151–33. As we pointed out in *Sills,* the safeguards against arbitrary official action are of greater

significance than the details in the statutory standard. 53 *N. J.* at 91. Those safeguards are found in ample measure in the provisions for hearing before the County Judge and review before the Appellate Division and, where necessary before this Court. *N. J. S. A.* 2A:151–44; *N. J. S. A.* 2A:151–44.1; *R.* 4:69; *R.* 2:2–3; *Burton v. Sills, supra,* 53 *N. J.* at 91; *Davis, Administrative Law Treatise p.* 40 *et seq.* (1970 *Supp.*).

The appellant cites *N. J. S. A.* 2A:151–44.2 in support of his view that County Judges may not now deny carrying permits to types of persons who had received carrying permits prior to the passage of the Gun Control Law in 1966. We find no pertinency in the citation. *N. J. S. A.* 2A:151–44.2 provides that applications shall be on "forms prescribed by the superintendent" and that "there shall be no further conditions or requirements added to the form or content of the application, or required by the licensing authority for the issuance of a permit than those set forth by the superintendent and those that are specifically set forth in this chapter." The pertinent form prescribed by the superintendent (see *Hearings on S.* 3691, *S.* 3604 *and S.* 3637 *Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary,* 90th Cong., 2d Sess., at 149 (1968)) contains various inquiries and concludes with certifications by the chief of police as to his investigation and by the County Judge as to his finding of "need" and his grant or denial of the permit. The requirement for a finding of "need" is explicitly set forth in *N. J. S. A.* 2A:151–44; in no sense is there any additional condition or requirement violative of *N. J. S. A.* 2A:151–44.2. The County Judge's determination must be made in the light of the circumstances presented to him and of sound current approaches on the issue of "need"; it would appear to be of no legal significance that, under earlier circumstances or earlier approaches, a predecessor County Judge had exercised his judgment in favor of a permit grant.

In prescribing a single application form for the entire State the Legislature pointed toward the proper goal of uniformity in the various counties and municipalities. But since the applications were ultimately being passed on by many individual County Judges there was still great danger of disparate treatment. To reduce this danger the Assignment Judges undertook to designate for each County a single Judge as the issuing authority under *N. J. S. A.* 2A:151–44. *Cf. State v. De Stasio,* 49 *N. J.* 247, 254, *cert. denied,* 389 *U. S.* 830, 88 *S. Ct.* 96, 19 *L. Ed. 2d* 89 (1967). And they undertook the furtherance of a strict policy which wisely confines the issuance of carrying permits to persons specifically employed in security work and to such other limited personnel who can establish an urgent necessity for carrying guns for self-protection. One whose life is in real danger, as evidenced by serious threats or earlier attacks, may perhaps qualify within the latter category but one whose concern is with the safety of his property, protectible by other means, clearly may not so qualify.

The appellant contends that the foregoing approach is "more restrictive than that intended by the Legislature." We find nothing whatever in the history or terms of the legislation to support this contention. In *N. J. S. A.* 2A:151–43 the Legislature listed the types of persons who may carry handguns without permits; these notably include designated persons charged with law enforcement and guarding responsibilities. In *N. J. S. A.* 2A:151–44 the Legislature made provision for other persons who could make a sufficient showing of "need," leaving to the Judges the required policy formulations as to what constitutes "need." The Legislature was fully aware that these formulations would represent the conscientious determinations of the Judges arrived at on the basis of their study of such expert materials as are available within and without our State. If the Legislature at any point differs with the approach adopted by the Judges, it may take appropriate action through amendment of the Gun Control Law. Indeed, it

may completely withdraw the authority to issue carrying permits from the Judges and place it more suitably in the hands of designated administrative agents.

Coming now to Siccardi's application, we are entirely satisfied that the County Judge's denial was proper and should be sustained. We are not concerned with Siccardi's theater or his home but only with his trips between the theater, the night depository and his home. So far as the protection of his property is concerned, he admittedly has suitable alternatives. So far as the suggested threats to his life are concerned, we accept the view of the local Chief of Police that they were not serious in nature and did not call for any police action. It is noteworthy that he has never been subjected to a street assault or attack and that, indeed, no member of his family which has operated the theater for over thirty-five years has ever thus been assaulted or attacked. The grant of a permit to him to carry a concealed handgun on his person or in his automobile would, as all of the expert testimony indicates, afford hardly any measure of self-protection and would involve him in the known and serious dangers of misuse and accidental use. And, finally, it may be noted that if the law is applied fairly and impartially as it must be, the grant of a carrying permit to him would call for permits to other theater managers as well as to the innumerable men in business who are obliged to carry funds and whose psychologically felt needs are no less than his. Surely such widespread handgun possession in the streets, somewhat reminiscent of frontier days, would not be at all in the public interest.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For reversal*—None.