60 A.3d 507

IN THE MATTER OF THE APPLICATION FOR A NEW JERSEY PERMIT TO CARRY A HANDGUN BY RICHARD PANTANO.

Superior Court of New Jersey
Appellate Division

Submitted October 23, 2012—Decided February 22, 2013.

Before Judges MESSANO, OSTRER and KENNEDY.

*Evan F. Nappen, P.C.,* attorneys for appellant *Richard Pantano (Richard V. Gilbert,* on the brief).

*Christopher J. Gramiccioni,* Acting Monmouth County Prosecutor, attorney for respondent State of New Jersey (*Patricia B. Quelch,* Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Richard Pantano appeals from the trial court's October 31, 2011 denial of his application for a permit to carry a firearm under *N.J.S.A.* 2C:58–4. The Manalapan Township Police Chief had approved Pantano's application in December 2010 and the State appealed. In a written opinion, Judge Francis P. DeStefano concluded after a testimonial hearing that Pantano had not demonstrated "a justifiable need to carry a handgun." *N.J.S.A.* 2C:58–4(d). Pantano asserts the court erred in finding no justifiable need, and, in the alternative, he argues the justifiable need requirement infringes his right to bear arms under the Second Amendment. *U.S. Const.* amend. II. We affirm.

## I.

■ We first address Pantano's challenge to the court's finding there was no justifiable need. We discern the following facts from the record.

Pantano owns a landscape supply business with annual gross receipts of $12 million, of which close to $2 million is paid in cash. At the hearing, Pantano testified about the typical transaction in his business:

> [A] contractor would come in and order, place an order for the materials he would need. Most of the time the materials are paver materials which are heavy, neighborhood of 2,000 pounds per pallet, so it's unrealistic for the contractor to be able to pick up his material. So our delivery system is what we use to take the materials to the contractor.

> Most of the contractors today are working on very tight budgets, and they're working with cash much more than ever. So we are now delivering the product a lot of times after hours when the contractors receive their deposits from the homeowners, [who] tend to be home between 5:00 and 7:00 p.m.

Pantano explained that he personally delivered materials. He would exchange paperwork and receive cash payments, sometimes ranging between $7000 to $18,000, which he would count in front of the customer and the customer's employees, some day-workers with whom even the customer was not familiar. He testified that while most of his deliveries were in Monmouth, Ocean and Middlesex Counties, he traveled throughout the State and sometimes outside it. He sought the permit to protect himself—as opposed to his cash—from a potential robbery. His concern was heightened by the state of the economy; he believed people were more desperate and willing to resort to crime. He was also concerned because many individuals, some strangers, were aware of when and where he would be in possession of large amounts of cash, creating repeated opportunities for a robbery.

Pantano explained that his willingness to "work[ ] with the contractor" by accepting cash and making deliveries at the customers' convenience, which many companies did not do, helped boost his business's growth. He stated that if he required payment in advance, by non-cash means, or at his office after delivery, some customers either would decline to do business with him or fail to pay him for the goods sold. He deposited cash at his bank as many as two or three times a day. Pantano asserted it would be impracticable to hire a security guard because he could not

predict when a contractor would call for an immediate delivery of supplies.

Pantano admitted that he had not been attacked nor had he been specifically threatened. However, his father was once the victim of an armed robbery and was stabbed.[1] Pantano also testified about an apparent trespasser at his business four years earlier. It was dark, around 7:30 p.m., and he had returned from a delivery and a cash receipt. Pantano recounted:

> I had just finished up my paperwork and one of my managers drove by and saw the lights on in the office so he had stopped in on me. As he approached the office he heard all kinds of scattling and stuff getting knocked over. At that point I happened to be walking out, and he said, Hey, hey, hey, someone's behind the building.
>
> Turns out there was somebody or persons apparently hiding behind the building, and when he approached, they were startled. They knocked over a whole bunch of material and fled. So we called Manalapan Police Department. They responded and they brought the dog out. The dog had gone on the scent trail, tracked it back through our nursery in the fields, and lost them somewhere.

Pantano testified that the police chief, who was a personal friend, had recommended he apply for the permit. "He actually was the one that told me I should apply. He understands my business, he's seen it grow. He understands it. He knows me personally, and he recommended that I apply for a handgun permit."

Judge DeStefano found that the nature of Pantano's practice of receiving large quantities of cash under the circumstances did not create a justifiable need. The judge also relied on the regulations defining "justifiable need" to mean "urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun." See N.J.A.C. 13:54–2.4(d). Citing In re Preis,

---

[1] Judge DeStefano limited Pantano from testifying about the armed robbery of his father, as the judge stated he was already aware of the incident. "I heard the story. I understand his father was robbed, he was knifed." In his decision, the judge noted that Pantano's father "ran a similar business."

118 *N.J.* 564, 573 *A.*2d 148 (1990), he explained "[g]eneralized fears for personal safety are inadequate, as is the need to protect property alone." The judge found the apparent trespassing incident, and the robbery and assault of Pantano's father, did not alter his conclusion.

> Petitioner has f[a]iled to provide the court with any specific threats, concerns, or previous attacks that constitute an "urgent need for self protection." The incident that was alleged to occur four years ago is insufficient to establish a justifiable need to carry a handgun. It is unclear what the intentions of this alleged trespasser were and this Court is not going to base its analysis on purely speculative claims. Petitioner needs to provide *specific* threats and simply asserting that an unknown person was outside the building after business hours is not enough. In addition, petitioner's concerns for his safety that stem from the unfortunate incident with his father do not rise to the level of a "justifiable need." Petitioner's concerns, although genuine, stem from the attack on his father. There is nothing to show that such attack is imminent or likely to happen to petitioner himself. Therefore, petitioner does not have any justifiable need to secure a permit to carry.

On appeal, Pantano argues the court erred in rejecting his claim of justifiable need. In particular, he argues the court should have deferred to the police chief's decision to approve his application. We disagree.

■ We are bound to accept the trial court's fact findings if supported by substantial credible evidence. *In re Return of Weapons to J.W.D.*, 149 *N.J.* 108, 116–17, 693 *A.*2d 92 (1997). However, we review the trial court's legal determinations de novo. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995); *In re Sportsman's Rendezvous Retail Firearms Dealer's License*, 374 *N.J.Super.* 565, 574–75, 866 *A.*2d 195 (App.Div.2005) (stating court exercises de novo review of trial court's statutory construction of *N.J.S.A.* 2C:58–2).

■ Judge DeStefano correctly described the legal test for establishing justifiable need. Pantano must show an urgent necessity to carry a handgun for self-protection. *Preis, supra,* 118 *N.J.* at 571, 573 *A.*2d 148; *Siccardi v. State*, 59 *N.J.* 545, 557, 284 *A.*2d 533 (1971). "The requirement is of specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means." *Preis, supra,* 118

*N.J.* at 571, 573 *A.2d* 148. The court must consider the justifiable need on a case-by-case basis. *Id.* at 576, 573 *A.2d* 148.

We discern no grounds to disturb Judge DeStefano's finding that Pantano failed to show justifiable need. Pantano attempts to distinguish his situation from those found insufficient in *Siccardi, supra; In re Application of "X",* 59 *N.J.* 533, 284 *A.2d* 530 (1971); *In re Application of Borinsky,* 363 *N.J.Super.* 10, 830 *A.2d* 507 (App.Div.2003); and *Doe v. Dover Twp.,* 216 *N.J.Super.* 539, 524 *A.2d* 469 (App.Div.1987). Pantano argues that in those cases, the applicant had available an alternative to carrying a handgun for self-protection, by obtaining a police escort as in *Siccardi* and *Application of "X",* or altering the applicant's activities as in *Borinsky,* or the applicant, as in *Doe,* simply did not face the same level of threat as did Pantano.

We are unpersuaded. Pantano was also able to avoid the perceived risk of robbery. His situation did not "differ materially" from that of other business-owners "who carry substantial funds on their persons, often in high crime areas." *Application of "X", supra,* 59 *N.J.* at 534, 284 *A.2d* 530. Pantano readily conceded that his competitors do not accommodate customers' reported desire to pay cash for deliveries at odd hours. Moreover, his claim that retaining a security escort was infeasible was conclusory. He presented no evidence that his business, which grossed over $12 million a year, could not reasonably afford protective services. There also was sufficient support in the record for Judge DeStefano's conclusion that Pantano faced no specific threat, notwithstanding the trespass incident and the robbery of his father.

We also reject Pantano's argument that the trial court erred in not extending sufficient deference to the police chief's decision to approve the permit. Pantano relies on *In re Application of Boyadjian,* 362 *N.J.Super.* 463, 828 *A.2d* 946 (App.Div.), *certif. denied,* 178 *N.J.* 250, 837 *A.2d* 1093 (2003). We held that while a trial court reviews de novo a police chief's denial of a firearms purchaser identification card (FPIC), the court "must, neverthe-

less act with appropriate regard for the local interest factor to the extent legitimately reflected in the police chief's denial, as well as for the chief's 'investigative experience and ... expertise[.]' " *Id.* at 476, 828 *A.*2d 946 (quoting *Weston v. State,* 60 *N.J.* 36, 46, 286 *A.*2d 43 (1972)).

For several reasons, Pantano's argument is inapposite. First, the chief did not testify nor was the court apparently presented with the chief's reasons for approving the application. Thus, there was no evidence of a reasoned exercise of experience and expertise for the court to consider. *Cf. Weston, supra,* 60 *N.J.* at 46, 286 *A.*2d 43 (discussing that typically, the chief would testify as to the reasons for denying a FPIC).

Second, deference is unwarranted under the circumstances. Pantano claimed the chief was a personal friend, was aware of information about Pantano's business outside the record of the permit application, and recommended that Pantano apply for the permit. While we recognize the chief did not testify, Pantano's undisputed assertions provide reasonable grounds to question the decision-maker's objectivity. *Cf. Brady v. Dep't of Personnel,* 149 *N.J.* 244, 256, 693 *A.*2d 466 (1997) (stating that deference to agency decision is limited if agency decision based on undisclosed evidence); *Kane Props., L.L.C. v. City of Hoboken,* 423 *N.J.Super.* 49, 65, 30 *A.*3d 348 (App.Div.2011) (stating that deference not due a municipal decision if "proceedings [were] tainted by conflict of interest"), *certif. granted,* 209 *N.J.* 597, 39 *A.*3d 200 (2012).

Third, the process for granting a FPIC, discussed in *Boyadjian,* differs from the process for granting a permit to carry, as requested here. The chief is authorized to issue the FPIC, subject to court action if there is an appeal. *See N.J.S.A.* 2C:58–3(d). By contrast, although the chief may approve an application for a permit to carry, only the court may actually issue the permit. *See N.J.S.A.* 2C:58–4(d); *see also Preis, supra,* 118 *N.J.* at 569, 573 *A.*2d 148 (referring to *N.J.S.A.* 2C:58–4, "So concerned is the Legislature about this licensing process that it allows only a

Superior Court judge to issue a permit, after applicants first obtain approval from their local chief of police.").

## II.

■ Pantano also renews before us his argument that application of the justifiable need requirement infringed his constitutional right to bear arms.

Judge DeStefano rejected Pantano's claim. He concluded New Jersey courts "have failed to extend the holding of [*District of Columbia v.*] *Heller* [554 *U.S.* 570, 128 *S.Ct.* 2783, 171 *L.Ed.*2d 637 (2008)] beyond its possession within the home for self defense," citing *In re Dubov*, 410 *N.J.Super.* 190, 981 *A.*2d 87 (App.Div. 2009), *Crespo v. Crespo*, 408 *N.J.Super.* 25, 972 *A.*2d 1169 (App. Div.2009), *aff'd*, 201 *N.J.* 207, 989 *A.*2d 827 (2010), and two unpublished decisions. In *Heller*, the United States Supreme Court overturned a District of Columbia statute that totally prohibited handgun possession in the home. *Heller, supra*, 554 *U.S.* at 635, 128 *S.Ct.* at 2821–22, 171 *L.Ed.*2d at 683. The Supreme Court later held that the Second Amendment right is "fully applicable" to the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, —— *U.S.* ——, 130 *S.Ct.* 3020, 3026, 177 *L.Ed.*2d 894, 904 (2010). Judge DeStefano concluded, "Since the challenged statute only regulates the carrying of a handgun outside the home, it does not infringe upon any conduct protected by the Second Amendment[.]"

On appeal, in urging us to find a constitutional violation, Pantano relies on *Woollard v. Sheridan*, 863 *F.Supp.*2d 462 (D.Md. 2012), and its interpretation of *Heller, supra*. The *Woollard* court held that *Heller* "left unanswered" whether the Second Amendment's protections extend beyond the home, " 'where the need for defense of self, family, and property is most acute.' " *Woollard, supra*, 863 *F.Supp.*2d at 467 (quoting *Heller, supra*, 554 *U.S.* at 628, 128 *S.Ct.* at 2817, 171 *L.Ed.*2d at 679). The *Woollard* court found that the Second Amendment right to bear arms applied outside the home, that state limitations on the right to carry were

subject to intermediate scrutiny, and that Maryland's right-to-carry law, which arguably imposed less stringent requirements than *N.J.S.A.* 2C:58–4, failed to survive intermediate scrutiny. *Woollard, supra,* 863 *F.Supp.*2d at 468, 474. Pantano urges us to reach a similar result here.

■ We decline to do so. We begin with the premise that "statutes are presumed constitutional[.]" *Whirlpool Properties, Inc. v. Dir., Div. of Taxation,* 208 *N.J.* 141, 175, 26 *A.*3d 446 (2011). We also hesitate to find a constitutional infirmity absent clear expression of the law from the United States Supreme Court, particularly where it would disturb settled law. *Id.* at 176, 26 *A.*3d 446 (declining to abandon legal standard, despite "measure of uncertainty," where there was "no ready or clear indication that the [United States] Supreme Court has signaled its abandonment").

In *Dubov, supra,* we concluded that *Heller* did not affect the constitutionality of *N.J.S.A.* 2C:58–3(c)(5).

> The issue in *Heller* was whether the Second Amendment protects only the right to possess and carry a firearm in connection with military service or also protects an individual's right to possess a firearm for other purposes such as self-defense and hunting. The Court held that the Second Amendment protects an individual right to keep and bear firearms, and that this holding required invalidation of District of Columbia statutes that totally prohibited handgun possession in the home and required any lawful firearm in the home to be disassembled or bound by a trigger lock, thus rendering it inoperable.
>
> However, the Court expressly indicated that its holding did not require invalidation of statutes that require a license to purchase or possess a firearm. In fact, the Court noted that "[r]espondent conceded at oral argument that he does not 'have a problem with . . . licensing, and that the District's law is permissible so long as it is 'not enforced in an arbitrary and capricious manner[,]' " thus obviating the need for the Court to address the validity of the specific provisions of the District of Columbia's gun licensing statutes. Therefore, *Heller* has no impact upon the constitutionality of *N.J.S.A.* 2C:58–3(c)(5).
>
> [410 *N.J.Super.* at 196–97, 981 *A.*2d 87 (citations omitted).]

By the same reasoning, *Heller* would not affect the constitutionality of *N.J.S.A.* 2C:58–4. *See Crespo, supra,* 408 *N.J.Super.* at 42, 972 *A.*2d 1169 ("[T]he majority opinion [in *Heller* ] should not be taken 'to cast doubt on longstanding prohibitions on the possession

of firearms by felons and the mentally ill, *or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.] ...'*") (emphasis added) (quoting *Heller, supra,* 554 *U.S.* at 626, 128 *S.Ct.* at 2816–17, 171 *L.Ed.*2d at 678).

The federal district court in New Jersey has concluded that our state law governing permits to carry handguns does not "burden any protected conduct" under the Second Amendment. *Piszczato-ski v. Filko,* 840 *F.Supp.*2d 813, 829 (D.N.J.2012). The court concluded that *Heller* addressed only the right to bear arms in the home.

> Heller's recognition of the right to "bear" arms as a right to "carry" does not inexorably lead to the conclusion that there is a general right to carry arms outside the home. Instead, this definition simply serves to emphasize the nature of the right as an individual right to carry "for a particular purpose—confrontation." *Heller,* 554 *U.S.* at 584, 128 *S.Ct.* 2783. *Heller* found that the individual right to carry a firearm for confrontation was obviously not an "unlimited" right to carry "for any sort of confrontation," but included a right to carry a handgun "for self-defense in the home." *Id.* at 595, 636, 128 *S.Ct.* 2783. The District of Columbia could not require that a handgun be kept inoperable in the home and could not "prevent a handgun from being moved throughout one's house." *Id.* at 584, 128 *S.Ct.* 2783 (quoting *Parker v. District of Columbia,* 478 *F.*3d 370, 400 (D.C.Cir. 2007)).
>
> The language of Justice Scalia's majority opinion deliberately limited the scope of the right recognized to the home.

[*Id.* at 821.]

Other courts have reached the same conclusion. *See, e.g., Williams v. State,* 417 *Md.* 479, 10 *A.*3d 1167, 1169, 1177 (2011) (holding that a statute prohibiting carrying a handgun outside the home without a permit was not at odds with *Heller* or *McDonald* ), cert. denied, —— U.S. ——, 132 *S.Ct.* 93, 181 *L.Ed.*2d 22 (2011); *Commonwealth v. Perez,* 80 *Mass.App.Ct.* 271, 952 *N.E.*2d 441, 451 (2011) ("The Second Amendment does not protect the defendant in this case because he was in possession of the firearm outside his home."); *see also Dorr v. Weber,* 741 *F.Supp.*2d 993, 1004–05 (N.D.Iowa 2010) ("The Court's recognition, in *Heller,* that prohibitions on carrying concealed weapons were lawful was in full accord with long-standing Supreme Court precedent.") (citing

*Robertson v. Baldwin,* 165 *U.S.* 275, 17 *S.Ct.* 326, 41 *L.Ed.* 715 (1897)).

Other courts have observed that the application of the Second Amendment to possession of firearms outside the home is at least uncertain. *See, e.g., Kachalsky v. Cnty. of Westchester,* 701 *F.*3d 81, 89 (2d Cir.2012) ("What we know . . . is that Second Amendment guarantees are at their zenith within the home. *Heller,* 554 *U.S.* at 628–29, 128 *S.Ct.* 2783. What we do not know is the scope of that right beyond the home and the standards for determining when and how the right can be regulated by a government."), *petition for cert. filed sub nom. Kachalsky v. Cacace,* 81 *U.S.L.W.* 3411 (U.S. Jan. 8, 2013) (No. 12–845); *Hightower v. City of Boston,* 693 *F.*3d 61, 72 n. 8 (1st Cir.2012) (declining to resolve the issue, but noting varying approaches to it among state and federal courts); *United States v. Masciandaro,* 638 *F.*3d 458, 475 (4th Cir.) (stating "[t]here may or may not be a Second Amendment right in some places beyond the home," and that "[o]n the question of *Heller's* applicability outside the home environment, we think it prudent to await direction from the Court itself"), *cert. denied,* —— U.S. ——, 132 *S.Ct.* 756, 181 *L.Ed.*2d 482 (2011); *United States v. Marzzarella,* 614 *F.*3d 85, 92 (3d Cir.2010) (noting that much of the scope of the Second Amendment right remains unsettled).

The Second Circuit in *Kachalsky* proceeded to assume that New York's law burdened the Second Amendment right to bear arms, and considered whether it passed constitutional scrutiny. Like New Jersey's statutory requirement of "justifiable need," *N.J.S.A.* 2C:58–4(d), the New York law requires a person seeking an unrestricted permit to carry a concealed handgun in public to show "proper cause," *N.Y. Penal Law* § 400.00(2)(f). New York courts have construed that law to require proof of a " 'special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession.' " *Kachalsky, supra,* 701 *F.*3d at 92 (citation omitted). Despite the burden placed on the permit applicant, the court held New York's "proper cause" requirement was constitutional after applying an intermedi-

ate level of scrutiny. *Id.* at 93–101.[2] The court held, "Restricting handgun possession in public to those who have a reason to possess the weapon for a lawful purpose is substantially related to New York's interests in public safety and crime prevention." *Id.* at 98. The same may be said of New Jersey's law and interests.

In sum, given the presumption of our law's constitutionality, the lack of clarity that the Supreme Court in *Heller* intended to extend the Second Amendment right to a state regulation of the right to carry outside the home, and the Second Circuit's explicit affirmation of a law similar to ours, we affirm Judge DeStefano's determination that Pantano's constitutional rights were not infringed.

Affirmed.

---

[2] We recognize that the Seventh Circuit Court of Appeals recently held that the Second Amendment extends to the right to carry a handgun outside the home. *Moore v. Madigan,* 702 *F.*3d 933, 945–46 (7th Cir.2012). In setting aside an Illinois law that banned concealed carrying of weapons, the court contrasted the Illinois law with New York's law held constitutional in *Kachalsky. Id.* at 944–45.